[No. 71947-1. En Banc.]
Argued May 7, 2002. Decided December 19, 2002.

NICOLE McGOWAN, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.
PUBLIC SCHOOL EMPLOYEES OF WASHINGTON, *Appellant*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

280

*Eric T. Nordlof* and *Elyse B. Waldman* (of *Public School Employees of Washington*); *Thomas F. Ahearne, Hugh D.*

*Spitzer*, and *Alice M. Ostdiek* (of *Foster Pepper & Shefelman, P.L.L.C.*); and *Thomas A. Leahy*, for appellants.

*Christine O. Gregoire, Attorney General*, and *William B. Collins* and *James K. Pharris, Senior Assistants*, for respondents.

*Michael W. Hoge, David J. Burman*, and *Annjanette M. Cooper* on behalf of Marysville School District, Connie Fletcher, and Washington Council of School Attorneys, amici curiae.

MADSEN, J. — Initiative 732 provides for annual cost-of-living increases for school district employees. At issue is whether the initiative mandates cost-of-living increases for all school district employees and, if so, whether it requires the State itself to fund cost-of-living increases for all district employees, or only for those employees that are state-funded as part of the State's constitutional duty to provide basic education. The superior court ruled that a cost-of-living increase is required for all school district employees but the State is required to fund the increase only for the state-funded employees. We agree that all school district employees are entitled to the cost-of-living increase and affirm to this extent. However, we hold that the initiative requires the State to fund the increase for all these employees and therefore reverse the superior court in part.

## FACTS

The voters passed Initiative 732 (I-732) in November 2000. Section 1 of the initiative explains that the state constitution "establishes 'the paramount duty of the state to make ample provision for the education of all children.' " I-732, § 1 (quoting CONST. art. IX, § 1). Section 1 states that

meeting this obligation requires well-qualified and experienced teachers. The section explains that salaries for educators were not keeping pace with inflation, threatening Washington's ability to compete with other states to attract and keep well-trained educators. Section 1 of I-732 concludes with: "The state must provide a fair and reasonable cost-of-living increase to help ensure that the state attracts and keeps the best teachers and school employees for the children of Washington." I-732 provides that "[s]chool district employees shall be provided an annual salary cost-of-living increase." I-732, § 2(1). The measure also includes sections providing for cost-of-living increases for certain community college system employees.

The cost-of-living increase for school district employees is "calculated by applying the rate of the yearly increase in the cost-of-living index to any state-funded salary base used in state funding formulas for teachers and other school district employees." I-732, § 2(1)(a). The measure states that "each school district shall be provided a cost-of-living allocation sufficient to grant this cost-of-living increase for the salaries, including mandatory salary-related benefits, of all employees of the district." *Id.* I-732 states that "[b]eginning with the 2001-02 school year, the state shall fully fund the cost-of-living increase in this section as part of its obligation to meet the basic education requirements under Article IX of the Washington Constitution." I-732, § 2(1)(d).

In order to place the provisions of I-732 in context, a brief overview of education funding is needed, particularly with regard to "basic education." Article IX of the Washington State Constitution requires state funding of basic education. *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978). The constitution states: "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders . . . ." CONST. art. IX, § 1. The state constitution requires "[t]he legislature [to] provide for a general and uniform system of public schools." CONST. art. IX, § 2. Prior to *Seattle School District*, public school education was funded in part through legislative

appropriation and in part by local school districts through special excess levies on property lying within the school districts. The Seattle School District challenged this system on the ground that, contrary to the constitutional mandate, it forced school districts to use special levies, dependent on voter approval, to provide for the "general and uniform system of public schools." *Id.* At the time the action in *Seattle School District* was brought, local levies were failing in many districts statewide.

This court held that in order to satisfy the constitution, the legislature must provide sufficient funds derived "through dependable and regular tax sources, to permit school districts to provide 'basic education' through a basic program of education in a 'general and uniform system of public schools.'" *Seattle Sch. Dist.*, 90 Wn.2d at 522 (emphasis omitted) (quoting CONST. art. IX, § 2). The court ruled that levies cannot fund basic education, as they do not provide a dependable and regular tax source. *Id.* at 526. Levies can, however, be used to "fund programs, activities and support services of a district which the State is not required to fund under its basic mandate." *Id.* (Emphasis omitted.) The court declined to decide what constitutes "basic education," holding that it is the legislature's responsibility to define basic educational requirements. *Id.* at 519-20.

The court did provide guidelines, however:

[T]he State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas. Education plays a critical role in a free society. It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival. It must prepare them to exercise their First Amendment freedoms both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding. The constitutional right to have

the State "make ample provision for the education of all [resident] children" would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the marketplace of ideas.

*Seattle Sch. Dist.*, 90 Wn.2d at 517-18 (citations omitted) (quoting CONST. art. IX, § 1).

In response to *Seattle School District*, the legislature reformed the State's education system for children in kindergarten through high school. It passed the Washington Basic Education Act of 1977, chapter 28A.150 RCW, established basic education funding formulas, and enacted legislation limiting school district levies. As the State says, the funding formulas are complex. Additional legislation has been passed from time to time establishing or relating to various educational programs. Some of the legislation has been determined to be part of basic education and some has not (either by the legislature or by a court determination).

The legislature continues to allow local school districts to submit excess property tax levy measures to the voters, and if approved, the revenue may be used to fund enrichment programs beyond "basic education." Levy revenue also may be used to enhance state or federal programs. Local districts also may use federal revenues, within certain restrictions, to carry out federal programs or, in some circumstances, to supplement state programs. Because money used for enrichment programs or to enhance basic education may not used for required basic education, it does not fall within the constitutional uniformity requirement. *Seattle Sch. Dist.*, 90 Wn.2d at 526.

Often it is not possible to label a specific employee as being exclusively paid with basic education money or enrichment dollars. State law does not require that a given employee be paid entirely from basic education dollars or from enrichment dollars. In general, state funding formulas are used to determine how much money, in total, based on certain student to staff ratios, must be appropriated for school districts to pay for basic education, and this money is then allocated to the individual districts. Each district is

thus given flexibility to meet local needs within state-prescribed staff ratios and salary requirements.

Against this backdrop, I-732 was enacted. Pursuant to the provisions of I-732, the State calculated its total cost-of-living increase obligation based upon the total number of state formula "staff units" and the average salary per unit—a method that limited its expenditure to state-funded staff.[1] In the 2001-03 biennium, this meant that approximately $318 million was appropriated by the State, as opposed to the over $400 million needed to provide the estimated cost-of-living increases to all school district employees over the biennium. The State also enacted legislation raising the lid for special levies, increased appropriations of federal funds, and reduced school district compensation rates for pensions, thus freeing up local funds for cost-of-living increases.

On June 21, 2001, *McGowan v. State* was filed by several individual voters and school employees in Thurston County Superior Court seeking declaratory relief. They maintained that I-732 requires the State to fully fund cost-of-living increases for all school district employees. On June 26, 2001, *Public School Employees of Washington v. State* (PSEW) was filed in this court by a school district organization against the State and several state officers seeking a writ of mandamus as well as declaratory relief. Like the *McGowan* plaintiffs, these plaintiffs contended that the State has to fully fund the school district employees' cost-of-living increases. On the State's motion, the *PSEW* case was transferred to Thurston County Superior Court and consolidated with *McGowan*. Also on June 26, 2001, the *McGowan* plaintiffs filed an amended complaint, adding additional plaintiffs, including two school districts and the Washington Education Association.

---

[1] The term "state-funded" staff or employee does not mean that each individual staff person is identified as being state-funded or not. Use of the funding formulas results in total monies that must be appropriated and allocated to districts. The term "state-funded" staff or employee is used in the parties' briefing and in this opinion as shorthand for the staff that the State must fund under its constitutional obligation to provide basic education.

On January 4, 2002, the superior court issued an order granting summary judgment to the State. The court ruled that I-732, § 2(1)(a) mandates that all school district employees must be provided annual cost-of-living increases, thus rejecting the State's argument that this section requires that cost-of-living increases be provided only to state-funded employees. The court further declared, however, that under section 2(1)(d), the State is required to fund the cost-of-living increases only for school district employees who are funded by the State as part of its constitutional obligation to fund basic education, but not for school district employees who are not funded by the State as part of its constitutional obligation to fund basic education.

The plaintiffs appealed, and this court granted direct review.

## ANALYSIS

The first issue is whether the State can challenge the superior court's ruling as to the meaning of section 2(1)(a) of I-732. As indicated, the State argued to that court that I-732 does not mandate a cost-of-living increase for all school district employees. The court disagreed, based upon language in section 2(1)(a). However, the State ultimately prevailed in its argument that it must fund cost-of-living increases only for state-funded employees because the court agreed that, under section 2(1)(d), the State's obligation to fully fund cost-of-living increases extends only to state-funded positions. The State now renews its argument that section 2(1)(a) requires cost-of-living increases only for state-funded positions. The appellants contend that the State did not cross-appeal the superior court's declaratory judgment and therefore is not entitled to pursue this argument.

■ Appellants are mistaken. Because the State prevailed, it was not required to cross-appeal the court's ruling as to section 2(1)(a); it seeks no further affirmative relief

from this court. RAP 2.4(a); RAP 5.1(d); *State v. Bobic*, 140 Wn.2d 250, 257-58, 996 P.2d 610 (2000). The State is entitled to argue any grounds in support of the superior court's order that are supported by the record. *Id.* at 258.

Both parties maintain that the meaning of I-732 can be determined from the plain language used. Our analysis of the meaning of the initiative language proceeds in light of settled principles. "An exercise of the initiative power is an exercise of the reserved power of the people to legislate." *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 204, 11 P.3d 762 (2000); *State ex rel. Heavey v. Murphy*, 138 Wn.2d 800, 808, 982 P.2d 611 (1999). When the people approve an initiative measure, they exercise the same power of sovereignty as the legislature does when it enacts a statute. *Amalgamated Transit*, 142 Wn.2d at 204; *Wash. Fed'n of State Employees v. State*, 127 Wn.2d 544, 556, 901 P.2d 1028 (1995). Once enacted, initiatives are interpreted according to the same rules of statutory construction as apply to the legislature's enactments. *Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n*, 141 Wn.2d 245, 280, 4 P.3d 808 (2000); *City of Spokane v. Taxpayers of City of Spokane*, 111 Wn.2d 91, 97, 758 P.2d 480 (1988). Thus, the court's aim is to determine the collective intent of the people who enacted the measure. *Amalgamated Transit*, 142 Wn.2d at 205. If the language is plain and unambiguous, the intent is gleaned from the language of the measure, and the court need go no further. *Id.* In determining intent from the language of an initiative measure, the court focuses on the language as the average well-informed voter would understand it. *Id.*; *City of Spokane*, 111 Wn.2d at 97. In construing an initiative, the court "must read it in its entirety, not piecemeal, and interpret the various provisions of the [initiative] in light of one another." *W. Petroleum Imps., Inc. v. Friedt*, 127 Wn.2d 420, 428, 899 P.2d 792 (1995). Where the people's intent is clearly expressed in the initiative measure, the court need not look to the Voters Pamphlet or other extrinsic sources to ascertain the voters' intent. *Senate Republican Campaign*

*Comm. v. Pub. Disclosure Comm'n,* 133 Wn.2d 229, 242, 943 P.2d 1358 (1997); *City of Tacoma v. State,* 117 Wn.2d 348, 356, 816 P.2d 7 (1991).

A grant of summary judgment is reviewed de novo, with the reviewing court engaging in the same inquiry as the trial court. *Amalgamated Transit,* 142 Wn.2d at 206; *Trimble v. Wash. State Univ.,* 140 Wn.2d 88, 92, 993 P.2d 259 (2000). A grant of summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Construction of a statute is a question of law reviewed de novo. *Amalgamated Transit,* 142 Wn.2d at 206.

Turning first to the question whether all school district employees must be provided cost-of-living increases, the parties debate whether the first sentence of section 2(1)(a) simply provides a method of calculating increases provided for by the measure or whether it also identifies who is entitled to the cost-of-living increases. The appellants point out that section 2(1) begins by stating that "[s]chool district employees shall be provided an annual salary cost-of-living increase in accordance with this section." Appellants urge that the first sentence of section 2(1)(a) then explains *how* the cost-of-living increases are to be calculated, i.e., it explains what inflation factor to use and what salary to apply the factor to. As to the latter, appellants maintain that the language "shall be calculated by applying the rate of the yearly increase in the cost-of-living index to any state-funded salary base used in state funding formulas for teachers and other school district employees" means that the cost-of-living increases are calculated by multiplying the per employee salary base times the number of eligible employees, to produce the state funding amount. I-732, § 2(1)(a). According to appellants, the result will be an amount sufficient to fund the increases for all eligible employees. Then, in appellants' view, the second sentence of section 2(1)(a) identifies *who* is entitled to the cost-of-living increases, i.e., the eligible employees, and in the appellants' view, all employees are entitled. The

second sentence of subsection (1)(a) provides that "each school district shall be provided a cost-of-living increase allocation sufficient to grant this cost-of-living increase for the salaries, including mandatory salary-related benefits, of *all employees of the district*." (Emphasis added.) Thus, the appellants argue that section 2(1)(a) means that all school district employees, whether state-funded or not, must receive cost-of-living increases.

The State maintains, on the other hand, that the sentence in section 2(1)(a) pertaining to "state-funded salary base" involves a budgeting term of art that leads to a different result. The argument is complex but boils down to the contention that "state-funded salary base" means that the cost-of-living increase calculation is made only with regard to employees in the state-funded salary base. That is, rather than simply a method used to calculate the cost-of-living increase for eligible individuals, the first sentence of section 2(1)(a) refers to the total salary expenditure for various classifications of employees funded by the State (certificated instructional staff, certificated administrative staff, and classified staff). Accordingly, in the State's view, the calculation in the first sentence yields only sufficient funds to provide cost-of-living increases to state-funded staff, and the State urges that the first sentence thus identifies *who* is entitled to the cost-of-living raises, i.e., only state-funded employees.

The State then stresses that the second sentence of section 2(1)(a) says that each school district shall be provided a cost-of-living allocation "sufficient to grant *this* cost-of-living increase for" district employees. (Emphasis added.) In the State's view "this" cost-of-living increase means the cost-of-living increase calculated based upon the total state-funded salaries—not including non-state-funded salaries.

The critical language in section 2(1)(a) respecting who is entitled to the cost-of-living increases does indeed appear in the second sentence, although it does not read as the State contends. The sentence clearly says that the districts will

be provided a cost-of-living allocation "sufficient to grant" the cost-of-living increase for the salaries "of *all* employees of the district." (Emphasis added.) The State reads the word "all" out of the sentence. Since *all* district employees are entitled to the cost-of-living increase, both state-funded and nonstate-funded employees are entitled to the cost-of-living increase. The word "this" in the second sentence means only that the increase as calculated must be provided all employees.

This reading is consistent with section 1 of the initiative, which states the goal of providing annual cost-of-living increases to keep teachers and other educators in Washington classrooms, and to "keep[] the best teachers and school employees for the children of Washington." Given that presently some teachers and other school employees are not state-funded, it is inconsistent with this goal to limit the cost-of-living increases to only state-funded staff.

The State, however, makes additional complex arguments based upon budgeting terms of art and practices in an attempt to show that only state-funded employees are entitled to the cost-of-living increase. These arguments do not persuade us. We do not believe that the average informed voter would understand "state-funded salary base" as a technical budgeting term used (1) to refer to the total salary expenditure for specified classifications of school district employees funded by the State and (2) to limit cost-of-living increases to only state-funded employees. Also, just because the method used to calculate cost-of-living increases involves state funding formulas/principles does not mean that the method used to make the calculation determines who must be paid.

The plain language of section 2(1)(a), read as a whole and in light of the rest of the initiative, says that all school district employees are entitled to the cost-of-living increases provided for by the initiative. Thus, the superior court's ruling as to the meaning of section 2(1)(a) is affirmed.

 The next question is whether under I-732 the State is required to fund the cost-of-living increases for all school district employees. Section 2(1)(d) provides that "[b]eginning with the 2001-02 school year, the state shall fully fund the cost-of-living increase in this section as part of its obligation to meet the basic education requirements under Article IX of the Washington Constitution." Appellants emphasize the words "fully fund," contending that they mean that all cost-of-living increases provided for in section 2 must be fully funded by the State. We agree.

The plain language of section 2(1)(d) places the obligation of full funding on the State. In addition, section 1 states that "[t]he *state must provide* a fair and reasonable cost-of-living increase." (Emphasis added.) Section (2)(1)(a) states in part that "each school district *shall be provided a cost-of-living allocation sufficient* to grant" the cost-of-living increase to all school district employees. (Emphasis added.) These sections show that the voters intended that the State fund the full cost of the raises for all school district employees.

 However, section 2(1)(d) says more than just that the State will fully fund the cost-of-living increases. It also provides that state funding is to be "part of its obligation to meet the basic education requirements" as required by the state constitution. I-732, § 2(1)(d). Appellants reason that all cost-of-living increases for all school district employees are part of basic education requirements that must be funded by the State. Appellants thus attribute intent to the voters to expand the definition of basic education.

As the State argues, such intent cannot be carried out. The clause in section 2(1)(d) stating that the increases will be funded "as part of [the State's] obligation to meet the basic education requirements under article IX of the Washington Constitution" is unconstitutional and therefore invalid. However, as explained below, this clause is severable, leaving intact the mandate that the State fully fund all school district employees' cost-of-living increases.

The constitutional flaw in the part of section 2(1)(d) that purports to define all cost-of-living increases as part of basic education is that this part completely disassociates the basic education requirement from any definition of basic education. That is, whether the cost-of-living increase is for a teacher, a bus driver, a security guard, a food services employee, a janitor, or any function or service of any or all school district employees, it is deemed to be basic education. As *Seattle School District* makes clear, not every possible staff position constitutes part of basic education. More fundamentally, the subsection provides that a *type of funding* will be basic education, rather than specifying a type of *education* or *educational service* that is provided by the funding, or *what instruction* the funding relates to. That is not consistent with the constitutional mandate. The subsection fails to provide any "substantive content to a basic program of education," *Seattle School District*, 90 Wn.2d at 520, within the meaning of article IX of the state constitution.

Moreover, section 2(1)(d)'s expansion of basic education to include the cost-of-living increases mandated by I-732 would lead to impermissible consequences contrary to the decision in *Seattle School District*. As noted, the court held there that compliance with article IX, sections 1 and 2 cannot be achieved through local levies because they are not a dependable and regular source of sufficient tax funds to provide basic education in a general and uniform system of public schools. *Seattle Sch. Dist.*, 90 Wn.2d at 522. If section 2(1)(d)'s characterization of cost-of-living increases as basic education in the constitutional sense were to stand, it would clearly run afoul of this holding. Regardless of function or previous funding categories, all employees would receive basic education dollars. A district employee who was previously funded by the district as part of an enrichment or enhancement program, and thus was not funded by state basic education dollars, would, after the cost-of-living increase, have a salary consisting chiefly of nonstate-funded, nonbasic education dollars, but also con-

sisting of state-funded, basic education dollars—and as years pass, the basic education proportion would increase. Basic education dollars would thus be tied to local levies with their deficiencies as a regular and dependable funding source, contrary to the requirements of article IX, sections 1 and 2 of the constitution and the holding in *Seattle School District*. This can lead to lack of uniformity in expenditures for basic education because, if in one district levies pass and the district is able to hire additional nonstate-funded staff, each of whom is also paid in part with cost-of-living basic education dollars, and in another district levies fail and nonstate-funded staff are laid off, with the corresponding drop in cost-of-living basic education dollars, over time the expenditure of the same kind of basic education dollars will be different in the two districts. If future levies fail, not only will funding for staff salaries be reduced, the basic education dollars tied to the levy dollars would be lost.

Thus, although part of section 2(1)(d) shows intent to expand the scope of basic education to include cost-of-living increases for all school district employees, the effort falls short of what is required by the constitution and *Seattle School District*. When the people act in their legislative capacity, they are subject to constitutional mandates. *Amalgamated Transit*, 142 Wn.2d at 204.

We hold that the portion of section 2(1)(d) that defines the cost-of-living increases as part of basic education is unconstitutional. It clearly seeks to expand basic education in a way that is contrary to constitutional principles.

■■ ■■ However, an act or statute is not unconstitutional in its entirety unless invalid provisions are unseverable and it cannot reasonably be believed that the legislative body would have passed one without the other, or unless elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes. *Gerberding v. Munro*, 134 Wn.2d 188, 197, 949 P.2d 1366 (1998); *State v. Crediford*, 130 Wn.2d 747, 760, 927 P.2d 1129 (1996). A severability clause may provide the assurance that the legislative body would have enacted

remaining sections even if others are found invalid. *Gerberding*, 134 Wn.2d at 197. It is not necessarily dispositive on that question, though. *Leonard v. City of Spokane*, 127 Wn.2d 194, 201, 897 P.2d 358 (1995). The unconstitutional and constitutional portions may be so interrelated that, despite the presence of a severability clause, it cannot reasonably be believed that the legislative body would have passed the latter without the former. *Id*.

These principles concerning severability apply here, where the invalid clause is only part of section 2(1)(d). The "[i]ndependence of the valid from the invalid parts of an act does not depend on their being located in separate sections." 2 Norman J. Singer, Statutes and Statutory Construction § 44:4, at 578 (6th ed. 2000). The invalid provision[2] must be grammatically, functionally, and volitionally severable. *Id*. § 44:4, at 570. Thus, the fact that only part of section 2(1)(d) is invalid is not, in and of itself, a bar to severing it from the remainder of section 2(1)(d) and the rest of the initiative. *See, e.g., Household Fin. Corp. v. State*, 40 Wn.2d 451, 244 P.2d 260 (1952) (unconstitutionality of provision for de novo trial in superior court in appeal section of an act did not render remainder of appeal section invalid); *State ex rel. French v. Clausen*, 107 Wash. 667, 182 P. 610 (1919) (the first sentence of Laws of 1919, § 1 provided that the governor would appoint five citizens to a commission, one of whom would be a member of the house and a second a member of the senate; the requirement that legislators be appointed was held unconstitutional but the remainder was upheld, i.e., five citizens would be appointed); *Shook v. Sexton*, 37 Wash. 509, 79 P. 1093 (1905) (a section of an ordinance, consisting of one sentence, provided that allowing certain animals to run at large was unlawful and imposed fines on owners whose animals ran at large; the language pertaining to the fines was invalidated and severed); *State v. Graham*, 14 Wn. App. 1, 538 P.2d 821 (1975) (second paragraph of a statute relating to unlawful opera-

---

[2] *Black's Law Dictionary* 1240 (7th ed. 1999) defines "provision" as a "clause in a statute, contract, or other legal instrument."

tion of a motor vehicle by an habitual offender invalidated and severed from first paragraph because it unconstitutionally changed the place of venue); *see also Lawrence v. City of Issaquah*, 84 Wn.2d 146, 524 P.2d 1347 (1974) (statute contained, in one sentence, a one-year durational requirement for residency and a one-year voter registration requirement for holding office; court stated in dicta that it appeared clear in light of a severability clause that even if the durational residency requirement were invalid, it would be severable from the voter registration requirement).

▆▆ ▆▆ I-732 contains a severability clause. Section 5 states that if any provision of the act is held invalid, the remainder of the act is not affected. This is evidence that the voters intended that the remaining provisions of the act be given effect if one provision is found invalid. Moreover, "[a] legislative declaration of the basis and necessity for enactment is deemed conclusive as to the circumstances asserted" unless it can be said that the declaration is obviously false on its face. *State v. Anderson*, 81 Wn.2d 234, 239-40, 501 P.2d 184 (1972). Here, section 1 of I-732 declares the basis and need for the legislation. It states that the constitution places the paramount duty on the State to make ample education for the state's children; that salaries for educators were not keeping pace with inflation, thus threatening this State's ability to compete with other states in attracting and keeping well-trained educators; and that the State must provide salary increases to help insure that the State attracts and keeps the best teachers and school employees for the state's children. I-732, § 1. This declaration shows that the primary intent underlying the initiative is to provide cost-of-living increases so that well-qualified teachers and other school employees will be available to educate the children in this state. We conclude, in light of this intent, that the voters would have enacted I-732 without the unconstitutional provision.

In addition, the part of section 2(1)(d) that is unconstitutional is not so interrelated with the rest of I-732 that the whole initiative must fall despite invalidity of part of

section 2(1)(d). The remainder of the initiative relating to public school districts is sufficiently independent of the invalid part. It provides for the cost-of-living increases, describes who is to get them, who is to fund them, and how they are to be calculated. The unconstitutional part of section 2(1)(d) is grammatically, functionally, and volitionally severable from the remainder of section 2(1)(d) and the rest of the initiative.

We hold that I-732 requires that the State fully fund the cost-of-living increases mandated for all public school district employees by I-732. The superior court's ruling to the contrary is reversed.[3]

■ Finally, the State contends that it satisfied any responsibility to fully fund all cost-of-living raises by providing alternative funding availability in the form of increasing the lid for special levies, increasing appropriations of federal funds, and reducing school district compensation rates for pensions. We disagree. The initiative does not provide for any such alternative funding mechanisms. The argument also must be rejected because, at the least, lifting levy lids will not assure that funding is available (it depends upon voter approval), and, more importantly, local levy funding does not constitute state funding of cost-of-living increases.

---

[3] Although the dissent claims that our decision "orders" the State to provide the funding for the cost of living increases required by I-732, in contravention of the analysis in *Hillis v. Department of Ecology*, 131 Wn.2d 373, 932 P.2d 139 (1997), the dissent is mistaken. Instead, we have construed I-732 in accord with its plain language. The initiative itself requires the State to fund all school district employees' cost-of-living increases—that is the statutory mandate. The State has argued, it is true, that just because a law provides for an appropriation does not mean the legislature is required to make an appropriation, citing *Hillis*, among other cases. However, that argument is unrelated to the issue we decide, i.e., it has nothing to do with determining the meaning of the language in the initiative.

It is, moreover, an argument relating to an issue that is not properly before this court. The legislature appropriated funds for the 2001-2003 biennium to provide cost-of-living increases only for state-funded employees under the State's mistaken view that the initiative required only that degree of funding. We will not speculate on what future appropriations will be made in light of our decision construing I-732.

## CONCLUSION

I-732 provides that all school district employees are entitled to the cost-of-living increases mandated by the initiative. Section (2)(1)(d) of the measure also provides that the State must fully fund all of the increases. However, part of this subsection also equates all the increases to basic education. This part is unconstitutional because (1) it treats every school district employee position as part of basic education solely because of certain funding for that position without regard to any education, educational service, or instruction paid for by the funding; and (2) it impermissibly ties basic education dollars to levy dollars (3) which can result in lack of uniformity in basic education funding in different districts. However, the invalid portion of section 2(1)(d) is severable, and the remainder of section 2(1)(d) as well as the other sections of the initiative are unaffected by the unconstitutionally.

The superior court is affirmed in part and reversed in part.

ALEXANDER, C.J., and SMITH, JOHNSON, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.

SANDERS, J. (dissenting) — Although I agree with the majority that I-732 requires the state to fully fund the cost-of-living increases for all school district employees, majority at 292, I nevertheless would affirm the trial court's order because this court's order that the legislature fund its program is inconsistent with *Hillis v. Department of Ecology*, 131 Wn.2d 373, 932 P.2d 139 (1997). While overruling *Hillis* is wholly justified, consistency requires we follow it rigorously until and unless it is overruled.

The State argues even if it had a statutory duty to pay all district employees, this court has no authority to order the legislature to provide the funds necessary to pay for the school district employees' cost-of-living increases. Br. of Resp'ts at 43-45. The State argues it is free to provide any

portion of the required funds—or none at all. *Id*. Moreover, the State claims it is excused from fully funding the cost-of-living increases because times have changed since the people passed I-732, when the state had a $1.1 billion surplus, and it can no longer afford to fully fund the costs of that program. *Id*. at 46.

The school district employees do not dispute the state's "poverty" claim, but contend the state's budgetary problems have no bearing on its duty to fully fund the cost-of-living increases. Appellants' Opening Br. at 17-19. Common sense would seem to be on the side of the school district employees, but *Hillis* stands in their way.[4]

*Hillis* reversed a trial court order requiring the Department of Ecology to process the plaintiffs' water permit applications as required by statute. 131 Wn.2d at 377. Ecology maintained it did not have the resources necessary to process these applications in a timely manner, if at all, notwithstanding the statutory duty. *Id*. at 378, 387.

> While it may be very tempting for this Court to order the Legislature to appropriate a reasonable amount of funds (or attempt to do so through court orders to Ecology) so that water rights applicants could have their requests for water decided in a timely manner, such action would violate the separation of powers doctrine.

*Id*. at 389-90.

---

[4] At oral argument the school district employees sought to distinguish *Hillis* from the current case. Wash. State Supreme Court oral argument, *McGowan v. State*, No. 71947-1 (May 7, 2002), 2002 Wash. LEXIS 802, *audio recording by* TVW (Washington State's Public Affairs Network), *available at* http://www.tvw.org. They argued that unlike the statute in question in *Hillis*, I-732 mandates the State to fully fund the cost-of-living increases. *Id*. But the school district employees turn *Hillis* on its head. There Ecology had adequate resources to process Hillis's nine water permit applications, but chose to allocate their resources elsewhere. *See* 131 Wn.2d at 385 (observing that the legislature appropriated $3,750,000 in 1994 for water permit applications). It was not necessary to order the State to allocate additional funds to process Hillis's applications. *Id*. By contrast, here the State has not appropriated sufficient funds to fully fund the school district employees' cost-of-living increases. Majority at 286. To achieve the desired result here the State would have to appropriate additional funds.

The *Hillis* dissent urged the court to hold the State to the same level of accountability as private citizens and corporations:

> Requiring an agency, otherwise unaccountable, to fulfill its statutory duty is the proper role of the court. *See* RCW 34.05.570, .574. Governmental agencies are not above the law but under it—like everyone else. Moreover, refusal to protect the statutory legal rights of any citizen is a dereliction of judicial duty which, in effect, allows lawless government to vanquish innocent citizens.
>
> . . . .
>
> In the private sector, entrepreneurs, citizens, and private corporations are frequently subjected to much greater liability than this for violating the legal rights of others. But there we would not hesitate to restrain (if not punish) the wrongdoer. At minimum we would require the wrongdoer to fully compensate the innocent victim. The rule *is no different when the state is a party.*

*Id.* at 409 (Sanders, J., dissenting).

Nevertheless today's majority has not seen fit to overrule *Hillis* and, until it does, it is improper for this court to apply a double standard by directing the State to provide sufficient funds to carry out its statutory duty to public employees while refusing a private claim to vindicate private rights.[5] Unfortunately, this is not the first example of arbitrary, unprincipled departures from the *Hillis* rule. *See, e.g., Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 39 P.3d 961 (2002).

Is the majority no longer convinced that " '[t]he decision to create a program as well as whether and to what extent to fund it is strictly a legislative prerogative' "? *Hillis*, 131 Wn.2d at 389 (quoting *Pannell v. Thompson*, 91 Wn.2d 591, 599, 589 P.2d 1235 (1979)). Has it forgotten the judiciary does not interfere with the alleged legislative prerogative to fund its programs? *Hillis*, 131 Wn.2d at 389. Or has some

---

[5] A limited exception exists for constitutionally mandated programs, but because the majority does not hold the program is constitutionally mandated, the exception does not apply here.

demon tempted the court to violate the separation of powers doctrine? *Id.* at 388.

Rather the majority attempts to finesse its departure from precedent by claiming it has not "order[ed]" the state to do anything but has rather simply construed the initiative "in accord with its plain language." Majority at 297 n.3.

> The initiative itself requires the State to fund all school district employees' cost-of-living increases—that is the statutory mandate. The State has argued, it is true, that just because a law provides for an appropriation does not mean the legislature is required to make an appropriation, citing *Hillis*, among other cases. However, that argument is unrelated to the issue we decide, i.e., it has nothing to do with determining the meaning of the language in the initiative.

*Id.* at 297 n.3. Apparently the majority claims the statute requires appropriate funding in a case where the State, according to the majority, has no legal obligation to provide that funding. However, for purposes of declaratory relief, a *justiciable* controversy requires that the interests involved be " 'direct and substantial, rather than potential, theoretical, abstract, or academic. . . .' " *Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 917, 949 P.2d 1291 (1997) (quoting *Nollette v. Christianson*, 115 Wn.2d 594, 599, 800 P.2d 359 (1990)). Declaratory judgment actions are not appropriately brought to resolve nonjusticiable controversies. Unless the court is willing to overrule *Hillis* (which I think it should), the claim is nonjusticiable and the appropriate remedy is dismissal.

Moreover the majority engages in endless hand-wringing over I-732's mandate that the State fully fund the school district employees' cost-of-living increases as part of its obligation to provide basic education. Majority at 292-95. The majority maintains this provision violates the notion of "basic education" articulated in *Seattle School District No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978) and thus violates

article IX of the constitution. Majority at 293-95. But "basic education" is a judicial creation, invented by *Seattle School District*, not a component of art. IX. What is more, *Seattle School District* does not provide a substantive definition of "basic education," it merely defers to the legislature to define that term. 90 Wn.2d 476 at 519. Our current majority takes *Seattle School District* a step further and weighs in with its own view of basic education. Majority at 293-95. But the majority's disagreement with the drafters of I-732 on this issue, however fundamental, does not render the statute unconstitutional. *Cf. Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 405-06, 858 P.2d 494 (1993) ("Even were we inclined to do so, it is not our role to substitute our judgment for that of the Legislature.").

But our ever vigilant majority does not stop there. Having declared the funding clause of I-732 DOA (dead on arrival), it nevertheless performs life-saving surgery, severing the offending phrase "as part of its obligation to meet the basic education requirements under Article IX of the Washington Constitution" (I-732, § 2(1)(d)) and declaring the remainder of the clause constitutional.[6] Majority at 296-97.

But all the majority's vigorous activity is for naught. Until this court overrules its prior decisions and holds the State to the same level of accountability as private citizens and corporations, this court cannot consistently impose a

---

[6] The majority gives new meaning to the doctrine of partial invalidation. There are no structural or syntactical indications the people intended the severability clause to apply to the sentence fragment the majority strikes; this fact, however, does not deter the majority from eliminating the passage it dislikes. Yet all but one of the cases it cites as authority struck down whole *sections, subsections, paragraphs*, or *sentences* of statutes. *Gerberding v. Munro*, 134 Wn.2d 188, 949 P.2d 1366 (1998) (cited by the majority at 294) (severing sections 4 and 5 of Washington Initiative Measure 573); *Shook v. Sexton*, 37 Wash. 509, 79 P. 1093 (1905) (cited by the majority at 295) (severing entire section of ordinance); *State v. Graham*, 14 Wn. App. 1, 538 P.2d 821 (1975) (cited by the majority at 295) (severing entire paragraph); *Household Fin. Corp. v. State*, 40 Wn.2d 451, 458, 244 P.2d 260 (1952) (cited by the majority at 295) (severing an entire sentence). The only case that comes close to supporting the majority's method of severance is *State ex rel. French v. Clausen*, 107 Wash. 667, 182 P. 610 (1919) (cited by the majority at 295) and even there the court severed a clause that was separated off by commas. *Id.* at 668.

legal duty on the state to fund the full cost of the school district employees' cost-of-living increases.

I therefore dissent.