93 P.3d 176 (2004)
CITY OF SEATTLE, a Washington municipal corporation; Port of Seattle, a Washington port district; Master Builders Association of King and Snohomish Counties, a Washington nonprofit trade association; Seattle-King County Association of Realtors, a Washington nonprofit trade association, Respondents,
v.
YES FOR SEATTLE, a nonprofit corporation and registered political campaign committee, Appellant,
King County, a political subdivision of the State of Washington; Jim Buck, Manager, King County Records and Elections Division, Defendants.
No. 53662-1-I.
Court of Appeals of Washington, Division 1.
June 1, 2004.
Publication Ordered June 25, 2004.
*177 Eric D. `Knoll' Lowney, Paul August Kampmeier, Davida Finger, Attorney at Law, Seattle, WA, Philip Albert Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Appellant.
Laura Beth Wishik, Robert David Tobin, Seattle City Attorneys Office, Seattle, WA, for Respondent City of Seattle.
Susan Margaret Ridgley, Traci Marie Goodwin, Port of Seattle, Seattle, WA, for Respondent Port of Seattle.
Robert D. Johns, Johns Monroe Mitsunaga PLLC, Bellevue, WA, for Respondent Master Builders Association of King and Snohomish Counties.
David Alan Crowell, Attorney at Law, Snohomish, WA, for Respondent Seattle-King County Association of Realtors.
COLEMAN, J.
Courts, while generally hesitant to conduct pre-election review, may review an initiative to determine whether it is beyond the scope of the initiative power before it is presented to the voters. Initiative rights do not exist when the legislature delegates the power to act exclusively to the legislative authority of a city, as opposed to the city as a corporate entity. In Snohomish County v. Anderson, 123 Wash.2d 151, 868 P.2d 116 (1994) and Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994), the Washington State Supreme Court held that the legislature delegated the power to act under the Growth Management Act (GMA) to the legislative authorities of counties and cities. Therefore, regulations under the GMA are not subject to the initiative process. We affirm the trial court's decision striking the initiative from the ballot because (1) pre-election review was proper to determine if the initiative was within the scope of the initiative power, (2) the initiative is a development regulation under the GMA, and (3) the invalid provisions of the initiative are not severable from the valid provisions.

FACTS
On July 11, 2002, Yes for Seattle submitted Initiative 80 (I-80) to the City of Seattle. On July 18, 2002, the City Attorney issued the ballot title "Save Seattle Creeks Initiative" for I-80. In November 2002, Yes for Seattle submitted the necessary signatures to King County Records and Elections for verification. The Seattle City Council reviewed the initiative and held public meetings concerning the measure. Under the City Charter, the Council had three options: (1) accept the *178 initiative and enact it into law; (2) reject the initiative and submit it to the voters; or (3) enact an alternative measure and present both its version and the initiative to the voters. On February 24, 2003, the City Council passed Resolution 30577 to place I-80 on the September 16, 2003 primary election ballot.
The City of Seattle, together with the other respondents, filed suit to enjoin placement of I-80 on the September 2003 ballot. Yes for Seattle moved to dismiss or to stay the suit until after the election. Yes for Seattle also moved for a CR 56(f) continuance. The trial court denied Yes for Seattle's motions.
On July 2, 2003, the City moved for a declaratory judgment declaring that I-80 exceeded the initiative power. In an oral decision, the trial court granted the City's motion, striking I-80 from the ballot. The court entered final judgment on August 1, 2003. Yes for Seattle sought direct review with the Washington State Supreme Court. The Supreme Court denied direct review and transferred the case to the Court of Appeals, Division One.

ANALYSIS
We first address whether the trial court erred in conducting pre-election review to determine if I-80 was beyond the scope of the initiative power. Generally, courts will not review initiatives before they are adopted by voters because courts do not want to interfere with the political process or issue advisory opinions. Philadelphia II v. Gregoire, 128 Wash.2d 707, 716, 911 P.2d 389 (1996). But an established exception to the general rule is that a court will review an initiative to determine if it is within the scope of the initiative power. Philadelphia II, 128 Wash.2d at 717, 911 P.2d 389. "The idea that courts can review proposed initiatives to determine whether they are authorized by article II, section 1, of the state constitution is nearly as old as the amendment [establishing the initiative power] itself." Philadelphia II, 128 Wash.2d at 717, 911 P.2d 389. Therefore, pre-election review was proper for the limited purpose of determining whether I-80 was within the initiative power.
Notwithstanding this well-established exception, Yes for Seattle, relying on Washington State Labor Council v. Reed, 149 Wash.2d 48, 65 P.3d 1203 (2003), argues that the court's review of I-80 was premature. In Reed, the Washington Supreme Court declined to conduct pre-election review of a referendum because there was "`insufficient time to engage in the deliberations that a case of this magnitude demands' and because an immediate decision was not required by the dates of implementation[.]" Reed, 149 Wash.2d at 53, 65 P.3d 1203. In Reed, no provisions of the initiative were to take effect until six weeks after the election. Yes for Seattle's initiative, on the other hand, would take effect within five days after the election. See Seattle City Charter, art. IV, § I.F. The initiative would also apply retroactively to permits already issued. See I-80 § 13(B). Thus, there would not be time after the election for the court to review the initiative before it took effect. Under these circumstances, pre-election review, limited to whether the initiative was beyond the initiative power, was appropriate.
Next, we address whether the trial court erred in finding that I-80 was beyond the scope of the initiative power. To determine whether a city ordinance is subject to the initiative power, the court must determine whether the measure is a legislative or administrative act and whether the power exercised in the initiative was granted to the city as a corporate entity or exclusively to the legislative authority of the city. Lince v. City of Bremerton, 25 Wash.App. 309, 311, 607 P.2d 329 (1980). The initiative process is not available when the legislature delegates power to act exclusively to the legislative authority of a city, as opposed to the city as a corporate entity. State ex. rel. Guthrie v. City of Richland, 80 Wash.2d 382, 384, 494 P.2d 990 (1972). The parties agree that I-80 is legislative. Thus, the issue is where the legislature granted the power to act.
The trial court determined that I-80 was in conflict with the GMA.[1] In Anderson and *179 Brisbane, the Washington State Supreme Court held that the legislature delegated the authority to act under the GMA to county legislative bodies. In Anderson, a citizens' group filed a referendum to repeal an ordinance adopting countywide planning policies pursuant to the GMA. The Supreme Court held that referendum rights do not exist under the GMA. The court concluded that duties assigned to the legislative authority under the GMA "cannot be carried out by initiative or referendum. For example, the statute directs the `legislative authority' to convene meetings and establish processes. These responsibilities cannot be performed by the exercise of a `yes/no' vote." Anderson, 123 Wash.2d at 156, 868 P.2d 116. The court also held that that "[t]he absence of any mention of referenda indicates the [GMA's] rejection of referendum rights." Anderson, 123 Wash.2d at 157, 868 P.2d 116.
In Brisbane, the Supreme Court again addressed referendum rights under the GMA. There, a citizens' group attempted to repeal a temporary critical areas ordinance under the GMA by referendum. The Supreme Court held that the legislature granted the power to act under the GMA to the county legislative body and, therefore, acts under the GMA are not subject to referendum. The court noted that "it would be difficult to balance the various interests contemplated by the Legislature" through the referendum process. Brisbane, 125 Wash.2d at 351, 884 P.2d 1326. The court concluded:
The Whatcom County Home Rule Charter may grant the people the right of referendum over ordinances enacted by the County. However, allowing exercise of that right over ordinances enacted pursuant to the Growth Management Act would run counter to and frustrate the declared purposes of the Act to prevent uncoordinated and unplanned growth and to encourage conservation and wise use of land.
Brisbane, 125 Wash.2d at 355, 884 P.2d 1326.
Yes for Seattle urges us to distinguish this case from Anderson and Brisbane because in those cases, the referenda were attempting to repeal ordinances enacted under specific requirements of the GMA. The City argues that this is a distinction without a difference. We agree with the City. Under Anderson and Brisbane, citizens cannot use the referendum process to repeal GMA ordinances. Under the same rationale, citizens cannot use the initiative process to enact GMA development regulations.[2]
Because citizens cannot use the initiative process to enact development regulations under the GMA, the issue is whether I-80 is a GMA development regulation.
Under the GMA,
"Development regulations" or "regulation" means the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances, critical areas ordinances, shoreline master programs, official controls, planned unit development ordinances, subdivision ordinances, and binding site plan ordinances together with any amendments thereto. A development regulation *180 does not include a decision to approve a project permit application, as defined in RCW 36.70B.020, even though the decision may be expressed in a resolution or ordinance of the legislative body of the county or city.
RCW 36.70A.030(7). The GMA also defines critical areas: "'Critical areas' include the following areas and ecosystems: (a) Wetlands; (b) areas with a critical recharging effect on aquifers used for potable water; (c) fish and wildlife habitat conservation areas; (d) frequently flooded areas; and (e) geologically hazardous areas." RCW 36.70A.030(5).
Yes for Seattle argues that while some portions of I-80 are aimed at development, development regulation is only incidental to creek restoration and I-80 therefore does not fall under the definition of the GMA. While the GMA does not list creek restoration specifically, the definition of a development regulation is sufficiently broad to encompass the provisions of I-80. Under the GMA, a development regulation is a control placed on development or land use. The precise issue, therefore, is whether I-80 places controls on development or land use. The trial court provided a good summary of the development and land use impacts of I-80:
The initiative places controls of development both directly and indirectly. It controls development directly by:
· Prohibiting future development over creeks or their buffers or over the historic corridors of creeks that have been diverted into pipes. I-80, Sections 3; 7D and E.
· Requiring developers to "assist in creek restoration when building a major creekside development," and making that requirement a condition on any development approval issued for the project. Section 4A.
· Requiring an applicant for a major development on creekside property to submit a "creek restoration plan as part of its application," which must include a City approved engineering plan for the restoration. Section 4B.
· Requiring specific actions as part of restoration efforts, including such things as, "Planting native vegetation and removing invasive species," "removal of fish barriers," and "daylighting the creek ... if the creek presently flows through a pipe or culvert...." Section 6A.
· Changing what is required for a permit applicant to have vested rights, and doing so retroactively. Section 13.
3. The initiative controls development near creeks indirectly by:
· Requiring the City to adopt a "Long-Term Creek Restoration Plan," which must include prohibiting development over creeks, their buffers, or the historic corridors of creeks that have been diverted into pipes. Sections 3, 7D & E, 8.
· Requiring that the City "ensure that development potential on the site is not lost due to the restoration project" and mandating that the City, "shall grant open space credit." Section 4C.
· Requiring the City to "ensure that creeks are restored concurrently with major creekside development." Section 5B.
· Directing that, when a creek has been "directed though a pipe" or "contains a fish passage barrier," then "the City shall require a property owner to daylight such creek and/or remove such barrier(s) during a major creekside development, or after giving required notice shall carry out the same and bill the costs to the property owner." Section 5B.
· Establishing mandatory policies for the City and barring the City from granting a development approval that is inconsistent with those policies. Sections 7 and 8.
· Requiring the City to "adopt regulations to further reduce stormwater pollution and impacts to creek ecosystems," and to "update Seattle's existing creek protection regulations including its critical areas regulations and shoreline master program." Section 10.
Clearly, much of I-80 places controls on development and land use, and consequently, I-80 as a whole is a development regulation under the GMA. The holdings of Anderson and Brisbane are thus controlling. We conclude that I-80 is beyond the initiative power *181 and the trial court did not err in striking it from the ballot.[3]
Yes for Seattle argues that even if I-80 is a development regulation, Seattle, as distinct from its legislative authority, has both statutory and constitutional authority to regulate creeks. Yes for Seattle points to RCW 35.21.090, which delegates the authority to construct dikes, levees, and embankments:
Any city or town shall have power to provide for the protection of such city or town, or any part thereof, from overflow, and to establish, construct and maintain dikes, levees, embankments, or other structures and works, or to open, deepen, straighten or otherwise enlarge natural watercourses, waterways and other channels, including the acquisition or damaging of lands, rights-of-way, rights and property therefore, within or without the corporate limits of such city or town, and to manage, regulate and control the same.
Additionally, Yes for Seattle points to the police powers derived from the state constitution and cites RCW 35.31.090, which gives the city power to regulate the pollution of streams, to argue that the people of Seattle have the authority to regulate creeks through initiatives. Yes for Seattle argues that I-80 falls clearly within these powers because it aims at protecting the city from flood damage and reducing pollution in the city's creeks. The City, on the other hand, argues that citing additional powers of the city cannot circumvent the GMA requirements. The legislature specifically granted the power to enact development regulations to the legislative bodies of cities and counties, and therefore, the enactment of development regulations cannot be accomplished by initiative. Allowing cities to enact development regulations outside the requirements of the GMA would defeat the comprehensive nature of the GMA and could serve to frustrate its purposes. Thus, Yes for Seattle's reliance on alternative statutory authority is misplaced.[4] All enactments that fall under the GMA definition of development regulations are subject to the requirements of the GMA. The trial court, therefore, properly concluded that the initiative was in conflict with the GMA and an invalid exercise of the initiative power.
The final issue we address is whether the trial court erred in finding that the valid portions of the initiative were not severable. Generally, if portions of an initiative are valid, the valid portions must be put on the ballot. Priorities First v. City of Spokane, 93 Wash.App. 406, 412, 968 P.2d 431 (1998). The initiative may not be severed, however, if the valid and invalid portions are so connected that the valid portions would be "useless to accomplish the legislative purpose." Priorities First, 93 Wash.App. at 412, 968 P.2d 431. Here, Yes for Seattle argues that the City was required to place the entire proposal on the ballot. In support of its contention, Yes for Seattle cites several out-of-state cases that conclude that if portions of the initiative are valid, the entire proposal must be placed on the ballot. See In re Initiative Petition 362, 899 P.2d 1145, 1152-53 (Okla.1995); Wyoming NARAL v. Karpan, 881 P.2d 281, 289 (Wyo.1994); In re Initiative Petition 358, 870 P.2d 782, 787 (Okla.1994); Town of Hilton Head Island v. Coalition of Expressway Opponents, 307 S.C. 449, 415 S.E.2d 801, 805 (1992); Dade County v. Dade County League of Municipalities, 104 So.2d 512, 515 (Fla.1958). The City contends that these cases are inapposite. Indeed, no Washington case supports this proposition, and in fact, the Washington courts' discussion of the severability of initiative provisions is contrary to the rule proposed by Yes for Seattle. Therefore, a *182 city is not required to place the entire proposal on the ballot if some of the provisions are valid.
Yes for Seattle also argues that the City was a least required to put the valid portions of the initiative on the ballot. Yes for Seattle points to I-80's severability clause:
The provisions of this ordinance are declared to be separate and severable. The Citizens of Seattle declare that they support each of the provisions of this Initiative independently, and their support for this Initiative would not be diminished if one or more of its provisions were to be held invalid. Thus, if any one or more of the provisions of this Initiative is declared to be contrary to law, then such provision or provisions shall be null and void and severed from the rest of this ordinance, and all other provisions of this Initiative shall remain valid and enforceable.
I-80 § 14. Severability clauses, however, are not dispositive:
A severability clause may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid. It is not necessarily dispositive on that question, though. The unconstitutional and constitutional portions may be so interrelated that, despite the presence of a severability clause, it cannot reasonably be believed that the legislative body would have passed the latter without the former.
McGowan v. State, 148 Wash.2d 278, 294-95, 60 P.3d 67 (2002) (citations omitted). Under this test, "[t]he invalid provision[s] must be grammatically, functionally, and volitionally severable." McGowan, 148 Wash.2d at 295, 60 P.3d 67. As discussed previously, the development aspects of I-80 are pervasive, with most sections of the initiative dealing with development. The nondevelopment sections on their own would not accomplish the goals of the initiative, as development and land use controls play the central role in the initiative. Additionally, the ballot title, which described the initiative to those signing the proposal, characterizes the initiative as primarily concerning development. The ballot title of an initiative is important because "voters will often make their decision based on the title of the act alone, without ever reading the body of it." Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 639, 71 P.3d 644 (2003). Here the ballot title stated:
Initiative Measure Number 80 concerns
Restoring Seattle's creeks through permitting conditions, mandates, and other measures.
This measure would:
require developers of "major creekside development" to daylight waterways, remove fish barriers, and take other restoration measures. It provides exemptions and incentives. Development is prohibited over creeks, creek "buffers," and "historic corridors" if piped creeks cannot be restored at their location. The measure changes the vesting rule and is retroactive in some circumstances. City mandates include: adopting a plan; maintaining current restoration efforts; and restoring creeks and funding creek restoration on public and private properties.
Given the nature of the initiative and the ballot title, the valid portions of the initiative are not severable from the invalid portions.[5]
The decision of the trial court is affirmed.
WE CONCUR: BECKER and BAKER, JJ.
NOTES
[1] The legislature enacted the GMA to address growth and implement comprehensive land use planning. Brisbane, 125 Wash.2d at 347, 884 P.2d 1326.

"The legislature finds the uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state. It is in the public interest that citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning. Further, the legislature finds that it is in the public interest that economic development programs be shared with communities experiencing insufficient economic growth." RCW 36.70A.010.
The GMA applies to counties that meet population and growth requirements or that choose to subject themselves to the GMA. RCW 39.70A.040(1), (2). The GMA requires the counties, and the cities within them, to develop comprehensive growth plans and development regulations to meet the comprehensive goals. RCW 36.70A.040(3), (4). The GMA also requires coordination with other counties. RCW 36.70A.100.
[2] Yes for Seattle also argues that if the GMA governs I-80, the Growth Management Hearing Board (GMHB), and not the courts, has jurisdiction to determine if the initiative is appropriate. The GMHB, however, has jurisdiction only over adopted ordinances and not proposed ordinances. Additionally, the GMHB does not have jurisdiction to review the scope of initiative powers. See RCW 36.70A.280.
[3] Yes for Seattle relies heavily on the recent decision in Maleng v. King County Corrections Guild, 150 Wash.2d 325, 76 P.3d 727 (2003), to argue that any doubts about the scope of an initiative must be resolved in favor of allowing the citizens to initiate the legislation, and therefore, the trial court should have allowed the initiative to be presented to the voters. Courts "liberally construe initiative proposals so as to give them effect, and a hypertechnical construction which deprives them of effect is to be avoided." Maleng, 150 Wash.2d at 334, 76 P.3d 727. This does not change our analysis, however, because I-80 is clearly a development regulation under the broad definition of the GMA.
[4] The City also contends that I-80 conflicts with the State Environmental Policy Act (SEPA). Because we conclude that I-80 conflicts with the GMA, it is not necessary to determine whether it is in conflict with SEPA.
[5] Our decision does not preclude the citizens of Seattle from bringing another initiative to enact the nondevelopment portions of the initiative.