**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WASHINGTON STATE REPUBLICAN
PARTY; DIANE TEBELIUS;
BERTABELLE HUBKA; STEVE
NEIGHBORS; MIKE GASTON; MARCY
COLLINS; MICHAEL YOUNG,
    *Plaintiffs-Appellees,*

and

WASHINGTON STATE DEMOCRATIC
CENTRAL COMMITTEE; PAUL
BERENDT; LIBERTARIAN PARTY OF
WASHINGTON STATE; RUTH
BENNETT; J.S. MILLS,
    *Plaintiffs-Intervenors-*
        *Appellees,*

v.

STATE OF WASHINGTON; ROB
MCKENNA, Attorney General; SAM
REED, Secretary of State;
WASHINGTON STATE GRANGE,
    *Defendants-Intervenors-*
        *Appellants.*

Nos. 05-35774
05-35780

D.C. No.
CV-05-00927-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
February 6, 2006—Seattle, Washington

Filed August 22, 2006

10025

Before: Dorothy W. Nelson, Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Rob McKenna, Maureen A. Hart, Jeffrey T. Even and James K. Pharris (argued), Office of the Washington Attorney General, Olympia, Washington, for the State of Washington (defendant intervenor-appellant).

Thomas F. Ahearne (argued), Ramsey Ramerman and Rodrick J. Dembowski, Foster Pepper & Shefelman PLLC, Seattle, Washington, for the Washington State Grange (defendant-intervenor-appellant).

John J. White, Jr. (argued) and Kevin B. Hansen, Livengood, Fitzgerald & Alskog, Kirkland, Washington, for the Washington State Republican Party (plaintiff-appellee).

David T. McDonald (argued) and Jay Carlson, Preston Gates & Ellis, LLP, Seattle, Washington, for the Washington State Democratic Central Committee (plaintiff-intervenor-appellee).

Richard Shepard (argued), Shepard Law Office, Inc., Tacoma, Washington, for the Libertarian Party of Washington State (plaintiff-intervenor-appellee).

## OPINION

FISHER, Circuit Judge:

For the second time in three years, political parties in Washington State are challenging the constitutionality of their state's partisan primary system, which was enacted as a result of the passage of Initiative 872 in the November 2004 state general election. In 2003, we concluded that Washington's previous "blanket" primary system was unconstitutional because it was "materially indistinguishable from the California scheme held to violate the constitutional right of free association in *Jones*." *Democratic Party of Wash. v. Reed*, 343 F.3d 1198, 1203 (9th Cir. 2003) (relying on *Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000)).

There are differences between Washington's pre-*Reed* blanket primary and the "modified" blanket primary being challenged in this case, and we are mindful that Initiative 872 reflects the political will of a majority of Washington voters. Nonetheless, although attempting to craft a primary system that does not unconstitutionally burden political parties' right of association under the First and Fourteenth Amendments, Initiative 872 fails to do so. Rather, the Initiative retains a partisan primary, in which each candidate may self-identify with a particular party regardless of that party's willingness to be associated with that candidate. The State of Washington and Initiative 872's sponsor, the Washington State Grange (the Grange),[1] have not identified any compelling state interests — apart from those the Supreme Court rejected in *Jones* — that would justify the Initiative's severe burden on the political

---

[1]The Washington State Grange is a subsidiary organization of the National Grange, which is described by its Washington chapter as "America's oldest farm-based fraternal organization" and as "a non-partisan, grassroots advocacy group for rural citizens with both legislative programs and community activities." Washington State Grange, *What is the Grange*, Official Website *at* http://www.wa-grange.org/whats_the_grange.htm.

parties' associational rights; nor is Initiative 872's modified blanket primary narrowly tailored. We cannot sever the unconstitutional provisions from Initiative 872 because "it cannot reasonably be believed that" Washington voters would have passed Initiative 872 without its unconstitutional provisions. *McGowan v. State*, 60 P.3d 67, 75 (Wash. 2002). Accordingly, we hold that Washington's modified blanket primary as enacted by Initiative 872 is unconstitutional and affirm the district court's permanent injunction against the implementation of the Initiative.

## I.   Background

To understand the flaw in Initiative 872's partisan primary system, it is helpful to review the nature and structure of the primary process in general. A political primary is often thought of as a "meeting of the registered voters of a political party for the purpose of nominating candidates . . ."; and a common definition of a primary election is a "preliminary election in which voters nominate party candidates for office." American Heritage College Dictionary 1086 (3d ed. 2000). The Supreme Court has characterized a candidate nominated in a primary as the party's "standard bearer," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997), or "ambassador to the general electorate in winning it over to the party's views," *Jones*, 530 U.S. at 575. In states that have adopted a "closed" primary system, each party (or traditionally at least each of the two major parties) selects its nominees who are to appear on the general election ballot as that party's candidates for particular offices. This type of primary is referred to as "closed" because only voters who formally associate themselves with a party in some fashion in advance of the primary may vote in that party's primary and thereby select the party's nominee. *See Jones*, 530 U.S. at 577; *see also* Alexander J. Bott, Handbook of United States Election Laws and Practices: Political Rights 21, 43, 139 (1990).

Although many states employ a closed primary, other alternative primary systems have been and continue to be used in some states. One such alternative used to be the "blanket" primary, until the California version was held unconstitutional in *Jones*. In contrast to closed primaries where each party's nominee is selected by voters pre-affiliated with that party who vote only in that party's primary, a blanket primary system uses a common primary ballot shared by all candidates for particular elective offices. All voters, regardless of their own political party affiliations (if any), could — until *Jones* — vote for any candidate appearing on the blanket primary ballot regardless of that candidate's designated political party affiliation.[2] The candidate who received the greatest number of votes in relation to other candidates with the same party affiliation would become that party's nominee who would advance to the general election ballot. For example, each of the Democratic and Republican candidates with the greatest number of votes in the blanket primary would appear as the only candidate identified with that particular party designation on the general ballot. *See Jones*, 530 U.S. at 570. The Supreme Court, however, held that California's blanket primary violated the state political parties' right of association under the First and Fourteenth Amendments, because allowing nonparty members to vote for party candidates forced a party's members to associate with voters who were members of rival parties in the selection of that party's nominee for the general election. *See id.* at 577.

Invoking *Jones*, the political parties in Washington challenged the blanket primary that had operated in that state since 1935. *See Reed*, 343 F.3d at 1201. Like the California primary, the Washington primary at issue in *Reed* advanced each of the top primary election vote-getters within the same

---

[2]For example, a primary voter could "split the ticket" between a Republican gubernatorial candidate, a Democratic candidate for attorney general and a Libertarian candidate for secretary of state.

party to the general election ballot. *See id.*[3] We held Washington's blanket primary unconstitutional in 2003 because it was "materially indistinguishable from the California scheme" that the Supreme Court invalidated in *Jones*. *Id.* at 1203.[4]

In the aftermath of *Reed*, two parallel efforts ensued to create a replacement primary system — one undertaken by the Washington state legislature and the other a ballot initiative sponsored by the Grange. In January 2004, the Grange filed the text of what was to become Initiative 872 on the November 2004 Washington ballot with the Washington Secretary of State. Initiative 872 made a number of changes to Washington's previous blanket primary system; but significantly, it retained the partisan nature of the primary. As the official voters' pamphlet explaining Initiative 872 stated, the Initiative "concerns elections for *partisan* offices" and "would change the system used for conducting primaries and general elections for *partisan* offices." (Emphasis added.)[5]

---

[3]"Minor" political parties were treated somewhat differently under Washington's pre-*Reed* blanket primary in that they were allowed to avoid splintering their limited constituency at the blanket primary stage. They held their own nominating conventions prior to the blanket primary, and the single candidate each such minor party selected by convention would advance from the blanket primary to the general election ballot if he or she obtained at least one percent of the blanket primary vote. *See*, *e.g.*, Wash. Rev. Code §§ 29.24.020, 29.30.095 (1993).

[4]Although California explicitly labeled those candidates who advanced to the general elections as "the nominee of [a] party," *Jones*, 530 U.S. at 570, a term Washington did not use, we concluded that Washington's avoidance of the label "nominee" was a "distinction[ ] without a difference." *Reed*, 343 F.3d at 1203.

[5]The Grange sponsored a website — http://www.blanketprimary.org/— as part of its advocacy efforts on behalf of Initiative 872. In early 2004, the "Frequently Asked Questions" portion of that website characterized the primary system that would be enacted by the Initiative as follows:

> The proposed initiative would replace the current nominating system with a qualifying primary, similar to the nonpartisan primaries used for city, school district, and judicial offices. As in

Two of the most important proposed changes were: (1) the redefinition of "partisan office" as "a public office for which a candidate may indicate a political party preference";[6] and (2) the adoption of a "top two" rule whereby the two candidates with the greatest number of votes in the primary advance to the general election regardless of their expressed party preference. Under the Initiative 872 primary system, therefore, those candidates expressing a particular party "preference" would be self-identified only;[7] and the winner of the largest number of votes among candidates with the same party preference would no longer be guaranteed a place on the general election ballot — an entitlement limited to the two top vote getters overall. Indeed, two candidates with the same party preference could be the only candidates for a particular office appearing on the general election ballot.[8]

In March 2004, the Washington legislature adopted two alternative primary systems, subject to the outcome of the

those primaries, the two candidates who receive the greatest number of votes would advance to the general election. Candidates for partisan offices would continue to identify a political party preference when they file for office, and that designation would appear on both the primary and general election ballots. . . .

At the primary, the candidates for each office will be listed under the title of that office, the party designations will appear after the candidates' names, and the voter will be able to vote for any candidate for that office (just as they now do in the blanket primary).

[6]Ballots for partisan office under Washington's pre-*Reed* primary system simply listed a political party or independent designation next to a candidate's name. *See* Wash. Rev. Code § 29.30.020(3) (1993) (repealed 2004); *see also Reed*, 343 F.3d at 1201 & n.3.

[7]The candidates' party preference designation on the ballot cannot be changed between the primary and general elections. *See infra* note 16.

[8]For example, if the 1996 gubernatorial primary had been conducted under the aegis of Initiative 872, two Democratic candidates — Gary Locke and Norman Rice — and no Republican candidate would have advanced from the primary to the general election.

vote on Initiative 872 in the November 2004 general election. As its first choice, the legislature adopted a "top two" primary system similar, though not identical, to the one the Grange proposed in Initiative 872.[9] As a precaution in case the anticipated legal challenges to the "top two" system proved successful, the legislature also adopted a "backup" primary system — the so called "Montana" primary — which is essentially a type of open primary.[10]

Governor Gary Locke vetoed the "top two" primary system in April 2004, so the "Montana" primary became Washington's primary system for the fall 2004 elections. Nevertheless, Initiative 872 passed with nearly 60 per cent of the vote in the November 2004 general election and became effective as Washington law in December 2004. The Washington legislature did not pass any other measure concerning the state's primary system in the first half of 2005, although the secretary of state did promulgate emergency regulations relating to Initiative 872 in May 2005.

The Washington State Republican Party (the Republican Party) filed suit in federal district court in May 2005, seeking a declaratory judgment and injunctive relief under 42 U.S.C. § 1983 against a number of county auditors with respect to the enforcement of Initiative 872 and the conduct of primary elec-

---

[9]A "top two" primary is also sometimes referred to as a "Cajun" or "Louisiana" primary, after the only other state that employs a similar sort of primary.

[10]*Jones* described an open primary as follows:

> An open primary differs from a blanket primary in that, although as in the blanket primary any person, regardless of party affiliation, may vote for a party's nominee, his choice is limited to that party's nominees *for all offices*. He may not, for example support a Republican nominee for Governor and a Democratic nominee for attorney general.

530 U.S. at 576 n.6. *See also* Bott, Handbook of United States Election Laws and Practices 21, 138.

tions. The Washington State Democratic Central Committee (the Democratic Party) and the Libertarian Party of Washington State (the Libertarian Party) moved to intervene as plaintiffs. The State of Washington and the Grange moved to intervene as defendants. The district court granted all of the motions to intervene and accepted the substitution of the State of Washington as a defendant in lieu of the county auditors, who dropped out as parties to this litigation.

In July 2005, the district court granted the political parties' motions for summary judgment and issued a preliminary injunction enjoining the enforcement of Initiative 872, *see Wash. State Republican Party v. Logan*, 377 F. Supp. 2d 907, 932 (W.D. Wash. 2005), and made the injunction permanent on July 29, 2005. Both the State of Washington and the Washington State Grange filed timely notices of appeal. We now affirm the district court's permanent injunction because the Initiative 872 primary unconstitutionally burdens the Washington state political parties' associational rights by permitting candidates to identify their party "preference" on the ballot, notwithstanding that party's own preference.[11]

## II.    Discussion

### A.    Standard of Review

"We review a summary judgment [order] granting or denying a permanent injunction for abuse of discretion and application of the correct legal principles." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004) (quoting *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987)). However, "any determination underlying the grant of an injunction [is reviewed under] the standard that

---

[11]The motion of FairVote — The Center for Voting and Democracy and others for leave to file a brief of *amici curiae* is granted, but we do not consider issues raised by amici that are beyond those argued by the parties.

applies to that determination." *Ting v. AT&T*, 319 F.3d 1126, 1134-35 (9th Cir. 2003). Accordingly, the district court's findings of fact are reviewed for clear error while questions of law are reviewed de novo. *See id.* at 1135.

The constitutionality of a state law is reviewed de novo. *See Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1103 (9th Cir. 2004). "[W]e review the application of facts to law on free speech questions de novo." *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003) (citing *Planned Parenthood v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1070 (9th Cir. 2002) (en banc)). Lastly, "severability is a question of state law that we review de novo." *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) (per curiam).

## B.   Right of Association

**[1]** "[T]he freedom to join together in furtherance of common political beliefs" — to form and join political parties — falls squarely within the right of association protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment against interference by the states. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). "Representative democracy in any populous unit of governance is unimaginable without" such freedom. *Jones*, 530 U.S. at 574. The right of association protects not only the activities of party stalwarts who "devote substantial portions of their lives to furthering [their party's] political and organizational goals," but also the more limited associational ties of those who "limit their participation [in the party] to casting their votes for some or all of the [p]arty's candidates." *Tashjian*, 479 U.S. at 215. Indeed, even if "it is made quite easy for a voter to change his party affiliation the day of the primary," that eleventh hour "cross[ing] over" still constitutes an act of association in that the voter "must formally become a

member of the party." *Jones*, 530 U.S. at 577 (emphasis omitted).

**[2]** The principle underlying the breadth of the right of association is one of mutuality: both the putative party member and the political party must consent to the associational tie. Accordingly, the freedom to associate necessarily includes some freedom to exclude others from the association. *See id.* at 574. "Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 n.22 (1981) (quoting Laurence H. Tribe, American Constitutional Law 791 (1978)). Neither voters nor political candidates can force a political party to accept them against the will of the party. *See Tashjian*, 479 U.S. at 215 n.6 ("[A] nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications."); *see also Duke v. Cleland*, 954 F.2d 1526, 1531 (11th Cir. 1992) ("[David] Duke has no right to associate with the Republican Party if the Republican Party has identified Duke as ideologically outside the party.").

**[3]** The right of association, however, especially when it intersects with the public electoral process, is not "boundless." *Clingman v. Beaver*, 544 U.S. 581, 589 (2005). "States have a major role to play in structuring and monitoring the election process, including primaries." *Jones*, 530 U.S. at 572. Constitutionally permissible state regulations touching upon political party affairs include those "requir[ing] parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion," "requir[ing] parties to demonstrate a significant modicum of support before allowing their candidates a place on [the general election] ballot" and "requir[ing] party registration a reasonable period of time before a primary election"

in order to prevent "party raiding."**12** *Id.* (internal quotation marks and citations omitted). Accordingly, when we are faced with a state electoral law that allegedly violates associational rights:

> we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotation marks and citations omitted). Therefore, we must first determine whether Initiative 872 severely burdens the Washington political parties' associational rights; if it does, we must then determine whether a compelling state interest justifies that burden and whether Initiative 872 is narrowly tailored to further that state interest.

### 1.  Severe burden

Washington and the Grange contend that Initiative 872 does not severely burden the political parties' associational rights. They point to dictum in *Jones* discussing with approval a *nonpartisan* blanket primary, *see* 530 U.S. at 585-86, and argue that Initiative 872 created just such a primary. We disagree, because the primary under Initiative 872 is not the kind of nonpartisan election *Jones* contemplated.

---

**12**Party raiding is "a process in which dedicated members of one party formally switch to another party to alter the outcome of that party's primary." *Jones*, 530 U.S. at 572.

The *Jones* dictum is found in that part of the opinion discussing the state interests California had identified in defense of its blanket primary. The Court identified four legitimate state interests that might justify allowing voters to vote for any candidate regardless of the candidate's party affiliation — "promoting fairness, affording voters greater choice, increasing voter participation, and protecting privacy" — but denied that these were compelling reasons to burden political parties' associational rights "*in the circumstances of [that] case.*" 530 U.S. at 584. The Court went on to reason, however, that even if these four interests *were* compelling, California's blanket primary was "not a narrowly tailored means of furthering them":

> Respondents could protect them all by resorting to a *nonpartisan* blanket primary. Generally speaking, under such a system, the State determines what qualifications it requires for a candidate to have a place on the primary ballot — which may include nomination by established parties and voter-petition requirements for independent candidates. Each voter, regardless of party affiliation, may then vote for any candidate, and the top two vote getters (or however many the State prescribes) then move on to the general election. This system has all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters are not choosing a party's nominee. Under a nonpartisan blanket primary, a State may ensure more choice, greater participation, increased "privacy," and a sense of "fairness" — all without severely burdening a political party's First Amendment right of association.

*Id.* at 585-86. In light of this statement, we agree that to the extent Initiative 872 can be fairly characterized as enacting a

nonpartisan blanket primary, *Jones* would lead us to uphold Washington's modified blanket primary.[13]

Initiative 872 resembles the *Jones* hypothetical nonpartisan blanket primary in some respects, but it differs in at least one crucial aspect. On the one hand, the "top two" feature of Initiative 872 seems indistinguishable from that referred to in *Jones*, as does the aspect of Initiative 872 that allows "[e]ach voter, regardless of party affiliation, [to] vote for any candidate." 530 U.S. at 585. However, the crucial point of divergence between Initiative 872 and *Jones* lies in the concept of partisanship. Although the Court did not specify in what sense it was using the term "nonpartisan," an election is customarily nonpartisan if candidates' party affiliations are not identified on the ballot. *See* Bott, Handbook of United States Election Laws and Practices 145 ("Nonpartisan elections are ones in which persons running for public office have their names listed on the ballot but not their party affiliation."). *Jones*' use of "nonpartisan" also appears to contemplate elections in which primary voters play no role in the nomination of any candidate as the representative of a political party. *See Jones*, 530 U.S. at 585-86 (asserting that the "constitutionally crucial" element in the inquiry is the parties' choice of their own representative, and noting that states may condition access to a nonpartisan primary ballot in part on prior and independent nomination by an established political party). We therefore understand the Court to align the term "nonpartisan" with the process of nominating a candidate to appear on a general bal-

---

[13]The Republican Party emphasizes that the statement in *Jones* is only dictum. But as we have recognized, Supreme Court dicta is generally entitled to "great weight," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004), and "appropriate deference," *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000). "[W]e do not blandly shrug them off because they were not a holding," *id.* (internal quotation marks omitted), and therefore we accord the *Jones* dictum the persuasive authority that it is due.

lot, without thereby nominating a candidate to represent a political party as its standard bearer.[14]

[4] In contrast to the *Jones* hypothetical primary, the primary envisioned by Initiative 872 is still overtly partisan. The Initiative redefined the concept of "partisan office," but those offices remain partisan and so does the primary.[15] By including candidates' self-identified political party preferences on the primary ballot, Washington permits all voters to select individuals who may effectively become the parties' standard bearers in the general election. Whether or not the primary candidate is a party's nominee, any candidate may appear on the ballot showing that party as his or her "preference" and (if

---

[14]The political parties argue that not only is Initiative 872 a partisan blanket primary, but it is indistinguishable from the primaries invalidated by *Jones* and *Reed* because it "nominates" candidates for the general election. Washington and the Grange counter that Initiative 872 merely "winnows" candidates. This debate is not particularly illuminating because "nominate" and "winnow" are two sides of the same coin — candidates who are not nominated are necessarily winnowed — and the Supreme Court has used both terms to describe the function of primaries. *See, e.g.*, *Storer v. Brown*, 415 U.S. 724, 734, 735 (1974) ("After long experience, California came to the direct party primary as a desirable way of nominating candidates for public office . . . . The direct party primary . . . functions to winnow out and finally reject all but the chosen candidates.").

Furthermore, even if Initiative 872's modified blanket primary can be said to "nominate" candidates, it does so in a way that is distinguishable from Washington's pre-*Reed* or California's pre-*Jones* blanket primaries. Unlike those primaries, the top vote-getters in each party under Initiative 872 are not guaranteed a place on the general election ballot; candidates advance only if they finish in the top two overall. There is therefore a real possibility that one of the political parties' top vote-getters will not even make it into general election or that two candidates from the same party will advance. This is not a situation squarely contemplated by *Jones* or the cases upon which it relies, all of which share the underlying assumption that only one candidate emerges from a partisan primary as the party's nominee. *See Jones*, 530 U.S. at 575 ("In no area is the political association's right to exclude more important than in the process of selecting *its nominee*.") (emphasis added) (citing cases).

[15]*See supra* note 5 and accompanying text.

one of the two top vote getters) may emerge as the only one bearing that designation in the general election. Whether or not the party wants to be associated with that candidate, the party designation is a powerful, partisan message that voters may rely upon in casting a vote — in the primary and in the general election. The Initiative thus perpetuates the "constitutionally crucial" flaw *Jones* found in California's partisan primary system. Not only does a candidate's expression of a party preference on the ballot cause the primary to remain partisan, but in effect it forces political parties to be associated with self-identified candidates not of the parties' choosing. This constitutes a severe burden upon the parties' associational rights.

Washington and the Grange argue against interpreting the Initiative 872 primary as partisan, and assert that a party "preference" is distinguishable from a party "designation" or some other stronger affirmative indication of party affiliation, such as membership. Such a distinction exists as a matter of logic, but it is not meaningful in the circumstances of this case. The district court came to the commonsense conclusion that "[p]arty affiliation plays a role in determining which candidates voters select, whether characterized as 'affiliation' or 'preference.' " *Wash. State Republican Party v. Logan*, 377 F. Supp. 2d 907, 926 (W.D. Wash. 2005). Washington urges that a candidate's political party preference simply provides "information for the voters." But a statement of party preference on the ballot is more than mere voter information. It represents an expression of partisanship and occupies a privileged position as the only information about the candidates (apart from their names) that appears on the primary ballot. Moreover, it also carries over onto the general election ballot.[16]

---

[16]The Washington Secretary of State appears implicitly to have recognized that voters' reliance on candidates' party preferences was comparable to their reliance on candidates' party designations, by amending Wash. Admin. Code § 434-230-040 (2005) to read as follows: "A candidate for partisan office who indicated a party preference on the declaration of can-

Importantly, "party labels provide a shorthand designation of the views of party candidates on matters of public concern . . . ." *Tashjian*, 479 U.S. at 220. Voters rely on party labels on the ballot in deciding for whom to vote. This political reality is illustrated by the Sixth Circuit's decision in *Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992). *Rosen* held unconstitutional the provision in Ohio's election law that "prohibit[ed] nonparty candidates for elective office from having the designation Independent or Independent candidate placed on the ballot next to their name." *Id.* at 171. The court relied on evidence that

> [v]oting studies conducted since 1940 indicated that party identification is the single most important influence on political opinions and voting. . . . [T]he tendency to vote according to party loyalty increases as the voter moves down the ballot to lesser known candidates seeking lesser known offices at the state and local level.

*Id*. at 172. Thus voters "are afforded a 'voting cue' on the ballot in the form of a party label which research indicates is the most significant determinant of voting behavior." *Id.* Similarly, to the extent Initiative 182 allows candidates to self-identify with a particular party — even if only as a "preference" — it cloaks them with a powerful voting cue linked to that party.

**[5]** Given that the statement of party preference is the *sole* indication of political affiliation shown on the ballot, that statement creates the impression of associational ties between

didacy *may not change the party preference between the primary election and the general election*." (Emphasis added.) The regulation previously stated that "[n]o person who has offered himself or herself as a candidate for the nomination of one party at the primary, shall have his or her name printed on the ballot of the succeeding general election as the candidate of another political party." Wash. Admin. Code § 434-230-040 (1997).

the candidate and the preferred party, irrespective of any actual connection or the party's desire to distance itself from a particular candidate. The practical result of a primary conducted pursuant to Initiative 872 is that a political party's members are unilaterally associated on an undifferentiated basis with *all* candidates who, at their discretion, "prefer" that party.

A hypothetical may help illustrate the situation confronting the political parties and the voters of Washington in an Initiative 872 primary. Let us assume the Republican Party holds its own privately run party convention prior to the modified blanket primary to select the Party's nominee for the primary ballot for a particular state office. *Cf. Jones*, 530 U.S. at 585 (noting that candidates appearing on a nonpartisan blanket primary ballot may be nominated by established political parties).[17] Let us further assume that two Republican candidates (both of whom are bona fide party members) — Candidate C, a conservative, and Candidate M, a moderate — compete against one another for the nomination and that Candidate C wins the Republican nomination at the convention. Lastly, let us assume the existence of a third candidate — Candidate W, a wild-eyed radical — who purports to "prefer" the Republican Party but who is not a Party member, whose views are anathema to the Party's membership and who does not participate in the Party's convention process. Despite Candidate C's party nomination, Candidate M and Candidate W decide that they want to appear on the primary ballot.[18] Given these

_____

[17]In fact, the Washington State Republican and Democratic Parties adopted contingency rules in anticipation of Initiative 872's enactment whereby those parties would select their nominees for state offices through private nominating conventions conducted before the state-run blanket primary.

[18]It is quite easy to put one's name on the Washington partisan primary ballot with any given political party preference under Initiative 872. All that is required is (1) a declaration of registered voter status in the appropriate jurisdiction (along with an address in that jurisdiction); (2) a decla-

assumptions, how would each of these candidates be designated on the ballot, and how would voters be able to distinguish among them?[19]

[6] Presented with this scenario at oral argument, the State of Washington conceded that all three candidates would be designated in an identical fashion on the primary ballot — all

---

ration of the position the candidate seeks; (3) *a declaration of party preference* or independent status; (4) a filing fee; and (5) a signed declaration that the candidate will support the Constitution and the laws of the United States and Washington State. The emergency regulations promulgated by the Washington Secretary of State in May 2005 confirmed the parties' inability to control who runs using their name: "neither endorsement by a political party nor a nominating convention are [sic] required in order to file a declaration of candidacy and appear on the primary election ballot." Wash. Admin. Code § 434-215-015 (2005).

[19]The questions posed by this hypothetical illustrate that a number of the arguments advanced by the State of Washington and the political parties need not be settled in order to resolve the central issue on appeal. First, the State of Washington argues that states are not compelled to provide political parties with a publicly financed primary to select party nominees and that by enacting the provisions of Initiative 872, it is "getting out of the 'party nomination' business." However, the inclusion of candidates' party preferences on the primary ballot suggests that Washington has not gotten out of the party nomination business entirely because Initiative 872 permits "spoiler" candidates from the same party and nonparty members to present themselves on an equal footing with party nominees on the ballot.

Second, Washington argues that "the associational rights of political parties do not include the right to have their nominees advance to the general election ballot." But even if we construed the political parties' argument to be that they have a right to have their respective nominees appear on the general election ballot, that argument misses the mark because it only addresses the "top two" nature of the Initiative 872 primary. The concern in this case is not that the top two vote-getters advance from the primary to the general election. Rather, it is that Initiative 872 provides candidates with a designated space on the ballot to express their party preference, notwithstanding the political parties' unwillingness to associate with a particular candidate or nominate that person as a standard bearer.

would be shown to have "Republican" as their "party prefer-ence."[20] This is the essence of Initiative 872's constitutional flaw. Because candidates can freely designate their political party preferences on the primary ballot, but the ballot does not show which candidates are the political parties' official nomi-nees (or even true party members), voters cannot differentiate (1) bona fide party members such as Candidates C and M from outsiders who purportedly prefer the party such as Can-didate W; or (2) party nominees such as Candidate C from "spoiler" intraparty challengers such as Candidate M.[21] The net effect is that parties do not choose who associates with them and runs using their name; that choice is left to the can-didates and forced upon the parties by the listing of a candi-date's name "in conjunction with" that of the party on the primary ballot. Wash. Rev. Code § 29A.04.110 (2004). Such an assertion of association by the candidates against the will of the parties and their membership constitutes a severe bur-den on political parties' associational rights. *See Tashjian*, 479 U.S. at 215 n.6; *Duke*, 954 F.2d at 1531.

In so holding, we do not question a political candidate's fundamental right to express a political viewpoint, including a political preference, more generally. *See, e.g.*, *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("[I]t can hardly be doubted that the [First Amendment's] constitutional guar-

---

[20]The text of Initiative 872 does not itself clearly prescribe how the can-didates' party preferences are to be worded on the primary ballot, nor do the Washington Secretary of State's emergency rules, issued on May 18, 2005, implementing the provisions of Initiative 872. For instance, the bal-lots could indicate party preference with letters like "D" and "R" or abbre-viations like "Dem." and "Rep." following the names of the primary candidates, without stating that they are "preferences" only. For purposes of this appeal, however, we assume that the ballots clearly state that a par-ticular candidate "prefers" a particular party.

[21]The second of these two scenarios of voter confusion would not be present if a party did not nominate a single standard bearer in a private convention prior to the modified blanket primary, but that would not cure the first problem.

antee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). We are not deciding that an expression of a party preference other than as a ballot designation — such as in campaign literature or advertising, a candidate statement in the voters' pamphlet or a news conference — constitutes a forced association between the candidate stating the preference and the political party being preferred. Rather, we are focused on the specific primary election ballot created by Initiative 872, and the one-sided expression of party preferences on that ballot. There is a constitutionally significant distinction between ballots and other vehicles for political expression. "Ballots serve primarily to elect candidates, not as forums for political expression." *Timmons*, 520 U.S. at 363. Here the ballot communicates a political association that may be unreciprocated and misleading to the voters, to the detriment of the political parties and their bona fide members.

The State of Washington attempts to counter our concern with this one-sidedness by itself invoking *Timmons*. It suggests that the lack of distinction between Candidates C, M and W on the primary ballot could be cured by the more detailed candidate statements that would likely reveal party membership and a candidate's status as a political party's nominee. Washington also contends that it is permissible to place candidates' party preferences on the ballot without regard to the parties' candidate preferences, because parties have no more right to use the ballot to send a message to voters than other politically minded, nonparty organizations do. *Cf. id.* We address and reject each of these contentions in turn.

Candidate statements cannot cure Initiative 872's one-sided party-preference labeling on the primary ballot. As previously discussed, political parties' names matter; they are shorthand identifiers that voters traditionally rely upon to signal a candidate's substantive and ideological positions. *See Rosen*, 970 F.2d at 172. For some voters, the party label may be enough; other voters may seek out more information about a candi-

date. As the Supreme Court observed in *Tashjian,* "[t]o the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise." 479 U.S. at 220. When the Libertarian Party challenged Oklahoma's semi-closed primary law by seeking to open the Libertarian Party primary beyond registered Libertarians and independents to *all* voters regardless of affiliation, the Court expressed its concern about the possibility of voters' being misled by party labels: "Opening the [Libertarian Party's] primary to all voters not only would render the [Libertarian Party's] *imprimatur* an unreliable index of its candidate's actual political philosophy, but it also would make registered party affiliations significantly less meaningful . . . ." *Clingman*, 544 U.S. at 595 (internal quotation marks omitted).

A party should not be placed in the position of having to overcome a false association between itself and a candidate by relying on the candidate's off-ballot clarifying statements.[22] It is too much to expect candidate statements to clear up the confusion engendered by the primary ballot regarding who is the "real" Republican, Democratic or Libertarian standard bearer for his or her respective party, never mind whom party members would acknowledge as a fellow member.[23]

---

[22]Although the political parties have not expressed their argument in exactly these terms, we note that the Supreme Court has long recognized that "the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986). When a law "impermissibly requires [someone] to associate with speech with which [he or she] may disagree," that person "may be forced either to appear to agree . . . or to respond." *Id.* at 15. "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster." *Id.* at 16.

[23]We recognize that party affiliations and political views of candidates in races for high profile state offices, such as governor, will be widely and publicly known, and in such cases, voters may not be relying on the party preference designation on the ballot. However, the same cannot be said for lower profile state offices where the expression of party preference on the ballot may well provide the decisive "voting cue." *Rosen*, 970 F.2d at 172.

We are similarly unconvinced by Washington's argument that the political parties' associational rights are not severely burdened because their inability to indicate their candidate preference on the primary ballot is no different from the inability of other, nonparty organizations, such as labor unions or better business bureaus, to indicate their candidate preferences. First, Washington's argument is undermined by the fact that Initiative 872 singles out candidates' political party preferences to be listed on the primary ballot, but not preferences with respect to any other organization. Second, a political party is historically different from other organizations with political interests in that it nominates candidates to run for political office in the party's name.[24] *See Jones*, 530 U.S. at 575-77; *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973) ("Under our political system, a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections."). We therefore reject the premise of an equivalency between political parties and other organizations that lies at the heart of Washington's argument.

In sum, because a party label — even if expressed more ambiguously as a party preference — conveys to voters "a shorthand designation of the views of party candidates on matters of public concern," *Tashjian*, 479 U.S. at 220, Initiative 872's party "preference" designation allows some candidates to create a mistaken impression of their true relationship with a political party. That severe burden on parties' associational rights is not negated by requiring voters to rely on candidates' or parties' off-ballot statements to clarify the nature or even lack of an actual party association.

---

[24]Like political parties, other organizations with political interests — from the National Rifle Association to the Sierra Club — may endorse candidates for office, but endorsement is not the equivalent of nomination. *Cf. Jones*, 530 U.S. at 580 ("The ability of the party leadership to endorse a candidate is simply no substitute for the party members' ability to choose their own nominee.").

## 2.  Compelling state interest and narrow tailoring

**[7]** Washington and the Grange have focused their arguments on appeal on the contention that Initiative 872 does not severely burden the political parties' associational rights at all. They have not articulated any compelling state interest that justifies such a burden. To the extent that we can read compelling state interests between the lines of their arguments — essentially those interests articulated and found inadequate by the Supreme Court in *Jones* — we conclude that such interests could be sufficiently served by a more narrowly tailored primary system. One obvious approach would be to create a true nonpartisan primary, such as the one discussed in *Jones*, where only a candidate's name without any party preference or designation appears on the ballot. Therefore, we hold that the modified blanket primary enacted by Initiative 872 in November 2004 is unconstitutional.

## C.  Severing Unconstitutional Provisions

**[8]** As a fallback position, Washington and the Grange argue that any unconstitutional provisions in Initiative 872 — namely those that provide for the designation of candidate party preferences — can be severed from the rest of the Initiative. Following Washington law, which guides our severability inquiry, *see Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) (per curiam), we conclude that it is not possible to sever the constitutionally deficient portions from the rest of Initiative 872.

**[9]** The Washington Supreme Court has set forth its state severability doctrine as follows:

> [A]n act or statute is not unconstitutional in its entirety unless invalid provisions are unseverable and it cannot reasonably be believed that the legislative body would have passed one without the other, or unless elimination of the invalid part would render

the remaining part useless to accomplish the legislative purposes. A severability clause may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid. It is not necessarily dispositive on that question, though. . . . The independence of the valid from the invalid parts of an act does not depend on their being located in separate sections. The invalid provision must be grammatically, functionally, and volitionally severable.

*McGowan v. State*, 60 P.3d 67, 75 (Wash. 2002) (internal punctuation marks, footnote and citations omitted).[25]

Conceptually speaking, severing all references to party preference from Initiative 872 seems fairly straightforward even though, as a practical matter, a fair number of provisions or portions of provisions would have to be severed.[26] However, even if we assume without deciding that the problematic provisions are "grammatically" or even "functionally" severable,[27] they are not "volitionally" severable. Volitional severability is another way of stating the *McGowan* requirement that "it cannot reasonably be believed" that Washington voters would have passed the remaining portions of Initiative 872 without the excised party preference provisions. *Id.*

---

[25]Initiative 872 contains no severability clause, although under *McGowan*, this fact is not dispositive. 60 P.3d at 75.

[26]The district court identified Sections 4, 5, 7(2), 7(3), 9(3), 11 and 12 as provisions of Initiative 872 that were "potentially severable." We need not decide whether or not the district court accurately identified all of the Initiative's provisions that are "potentially severable" because Initiative 872 fails the volitional prong of *McGowan*.

[27]We understand functional severability to be a restatement of the *McGowan* requirement that "elimination of the invalid part would [not] render the remaining part useless to accomplish the legislative purposes." 60 P.3d at 75.

**[10]** Even if we grant Washington and the Grange's argument that Washington voters understood that Initiative 872 redefined candidate partisanship (i.e., as a party preference rather than as a stronger form of party affiliation), excising all mentions of party preference from the modified blanket primary would transform a partisan primary into a nonpartisan one. It is not reasonable to believe that Washington voters would have passed Initiative 872 if they knew it would result in nonpartisan primaries for all statewide offices. Because the party preference provisions in Initiative 872 do not pass the volitional severability test in *McGowan*, we conclude that Initiative 872 cannot be saved by severing its provisions for candidate party preferences. We hold that Initiative 872 is unconstitutional in its entirety.[28]

### III.   Conclusion

Although the Constitution grants States "a broad power . . . to regulate the time, place, and manner of elections[, that power] does not justify, without more, the abridgement of fundamental rights, such as . . . the freedom of political association." *Tashjian*, 479 U.S. at 217 (internal citations omitted). A political party's "determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution." *Id.* at 224. Initiative 872 severely burdens the Washington political parties' associational rights by allowing all candidates to state their party preferences on the primary ballot. This one-sided statement of party preferences on the ballot has the potential to force a political party into an unwanted association with a candidate who may be anathema to everything the party stands for. We hold that Initiative 872 is unconstitutional in its entirety because the party preference provisions are not severable from the rest of Initiative 872

---

[28]Because we have held Initiative 872 to be unconstitutional under the First and Fourteenth Amendments, we do not reach any of the other arguments that the political parties advance with respect to Initiative 872.

under Washington law. The judgment of the district court is affirmed.

**AFFIRMED.**