

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MODUMETAL, INC., | ) | No. 76708-9-I |
| | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| XTALIC CORPORATION, | ) | |
| AND JOHN HUNTER | ) | UNPUBLISHED OPINION |
| MARTIN, | ) | |
| | ) | |
| Respondents. | ) | FILED: June 25, 2018 |

SPEARMAN, J. — John Hunter Martin left Modumetal Inc. to work for Xtalic Corp. Xtalic subsequently filed two patent applications describing processes in an area that both companies had been researching. Modumetal brought claims for trade secret misappropriation, breach of confidentiality obligations, and breach of contract against Martin and Xtalic. The trial court granted Xtalic's motion for summary judgment and denied Modumetal's CR 56(f) request for a continuance to pursue further discovery.[1] Because there is sufficient evidence to raise issues of material fact regarding Modumetal's claims, we reverse.

---

[1] Co-defendants Xtalic and Martin are referred to as "Xtalic" throughout, except where an issue is raised that requires each to be discussed separately.

## FACTS

Modumetal, Inc. and Xtalic Corporation are competitors in the field of research, development, and manufacture of materials and technology engineered at the nano-scale.[2] Modumetal is based in Washington, and Xtalic is based in Massachusetts. Both companies have worked with a process known as "electrodeposition." This process allows a coating of metal to be deposited onto a surface by submersing the item in a specially developed chemical bath and running an electrical current through it. The resulting metallic coating can be used to improve corrosion and wear resistance, and aesthetic qualities. This process can also be used to form freestanding metal by depositing material thickly and then detaching the substrate, a process known as electroforming. The electrodeposition process can be manipulated by altering various parameters, such as the metal or alloy being plated, the composition and temperature of the bath, bubbling various gases through the bath, and changing the frequency, magnitude, or duration of the current. The goal is to develop and identify valuable and unique "recipes" for effectively electrodepositing a particular metal or alloy onto a particular substrate on an industrial scale for commercial purposes.

In 2008, John Hunter Martin began working at Modumetal as a student intern. At that time, Modumetal was one of the few companies in the world actively working to develop a commercially viable system for electrodepositing aluminum coatings from ionic liquids. On June 13, 2008, Martin signed Modumetal's "Assignment of Inventions, Non-Disclosures and Non-Solicitation Agreement." Clerk's Papers (CP) at 4130-32. The agreement defined "Confidential Information" as:

---

[2] A nanometer is .000001 of a millimeter.

> [I]nformation (i) disclosed to or known by me as a consequence of my employment with the Company, (ii) not generally known to others outside the Company, and (iii) which relates to the trade secrets or otherwise to the research, development efforts and methodologies, testing engineering, manufacturing, marketing, sales, finances or operations (including without limitation any processes, formulae, methods, techniques, devices, know-how, manufacturing processes, customer lists, sales statistics, tactics and projections, marketing strategies and plans, and personnel information or data) of the Company or of any other party which has entrusted such information to the Company in confidence.

CP at 4130.

Martin agreed to "never disclose or use any of the Confidential Information for the benefit of myself or another, unless directed or authorized in writing by the Company to do so." CP at 4131. He further agreed that during his employment, he would avoid "financial or other interests or relationships with the Company's customers, suppliers or competitors which might impair my independence of judgment on behalf of the Company." Id. The agreement did not contain an express non-compete clause.

In 2009, following his graduation from the University of Washington, Modumetal hired Martin as a full time employee. In February 2010, Martin took the lead on a research project involving electrodeposition of aluminum onto various substrates from ionic liquid baths. The work was partially motivated by Apple's interest in developing a commercially viable process for electrodepositing aluminum onto iPhone cases to improve corrosion resistance and the surface finish. Modumetal considered its research into electrodeposition of aluminum using ionic liquids, as well as its relationship with Apple, to be highly confidential.

As part of this research, Modumetal procured several premixed ionic baths designed for the electrodeposition of aluminum from BASF, a large commercial chemical company. "Al01" contained a ratio of 1.5/1 $AlCl_3$ to 1-ethyl-3-methylimidazoium

3

(EMIM); "AlO2" consisted of AlO1 plus an additive known as sodium dodecyl sulfate (SDS); and "AlO3" consisted of AlO1 plus an additive known as hexadecyltrimethylammonium chloride (HDMAC). CP at 1799, 4004. At the time, BASF was not aware of any effective commercial scale process for using its liquids for electrodepositing aluminum, and it was very interested in Modumetal's research. Accordingly, Modumetal and BASF signed secrecy agreements to prevent each party from disclosing confidential information shared during the course of their dealings, including results from Modumetal's evaluation of BASF's ionic liquids.

Modumetal provided Martin with a textbook called "Electrodeposition From Ionic Liquids" to aid his work. CP at 1799. He used the premixed BASF ionic baths as a basis for his experiments, modifying them with additives and altering various parameters in an attempt to enhance the efficiency and effectiveness of the electrodeposition process. He experimented with various substrates, including flat steel, stainless steel, aluminum, and magnesium, as well as nickel-plated iPhone cases supplied by Apple. Martin also experimented with treating the substrates to enhance adhesion, a process known as "surface preparation." CP 4363. Despite these efforts, Martin claimed that he was "unable to get a satisfactory result on a repeatable basis." CP at 1799.

In July 2010, Martin's colleague Jesse Unger took over as lead researcher for the project. According to Modumetal's CEO, Christina Lomasney, Martin remained a member of Modumetal's "Corrosion Team" and would have been apprised of Unger's progress on the project via weekly team meetings. CP at 4003. Martin also expressly verified by signature (a practice known as "witnessing") some of Unger's lab notebooks regarding his continued research on electrodeposition of aluminum. CP at 1799, 3722.

4

In August 2010, Lomasney told Unger that Apple was pulling out of the project for reasons unknown at that time. Lomasney instructed Unger to continue the project, and the "[o]nly change is that we won't be focused on the iPhone substrates for now." CP at 2032. In September 2010, Unger submitted a report summarizing his experiments using "BASF Basionics EMIM Cl 1:1:5 $AlCl_3$ Ionic Liquid plating bath ... to determine the optimal conditions for aluminum deposition" and offering recommendations for future research. CP at 2096. According to Lomasney, "Modumetal was able to successfully plate aluminum onto different substrates while Mr. Martin was employed at Modumetal" and "made substantial progress on such research during that time." CP at 4004-05.

In late 2010, Martin applied for a position as an Engineering Project Manager at Xtalic. Martin's resume indicated that Modumetal was his only relevant experience after college. The resume also stated that Martin had multiple proprietary patents pending approval, including a "[d]eposition process for [a]luminum," and that his technical skills included "[m]etallic deposition with ... [m]olten [s]alt media."[3] CP at 4127.

Dr. Alan Lund, co-founder and Chief Technology Officer of Xtalic, interviewed Martin by phone in December 2010. Martin and Lund then exchanged roughly a dozen emails, culminating with Martin interviewing at Xtalic's Massachusetts offices in January 2011. After the interview, Martin emailed Xtalic employee Dr. Shiyun Ruan, stating that "[i]onic liquids are one of my favorite topics and would be happy to share what I know outside the scope of my current company's intellectual property." CP at 4154.

---

[3] Martin later admitted this was a reference to ionic liquids.

5

Xtalic decided that Martin was not experienced enough for that position, but they thought he might be a good candidate to join a team Xtalic was assembling to conduct research on electrodeposition of an aluminum-manganese alloy. In February 2011, Lomasney verbally recommended to Martin that he seek employment elsewhere. Soon thereafter, Xtalic offered Martin a job as a research and development engineer. Martin informed Modumetal that he was leaving and gave two weeks' notice, without mentioning that he had already been hired by Xtalic.

In March 2011, after moving to Massachusetts and beginning his new job, Martin emailed Christina Lomasney and told her "since I left [Modumetal] I have accepted a position at Xtalic." Martin assured Lomasney that he would "maintain full compliance with the non-disclosure agreement I signed." CP at 3534. Lomasney responded "I expect that you've a fun future in plating and metallurgy ahead of you" and reminded Martin of his obligations regarding the agreements he signed. She did not specifically mention aluminum. A few months later, counsel for Modumetal wrote Xtalic to ask that it take proactive steps to prevent breach of the Confidentiality Agreement. In particular, "to prevent the inadvertent use or disclosure of Modumetal confidential information ... Mr. Martin should be walled off from any involvement in the design of electroplating baths as well as in the production and testing of nanolaminated alloys containing nickel for use in corrosion and wear protection applications." CP at 5224-25. According to Lomasney, the letter did not expressly mention aluminum because Modumetal wanted to keep its aluminum research secret.

At Xtalic, Martin was immediately assigned to a new research team working on electrodeposition of an aluminum-manganese alloy. Dr. Chris Schuh, Xtalic's co-founder

and professor at Massachusetts Institute of Technology (MIT), began researching electrodeposition of aluminum alloys in 2006. Dr. Schuh's doctoral student, Shiyun Ruan, eventually completed her dissertation on the creation and electrodeposition of a nanocrystalline aluminum-manganese alloy. Dr. Ruan's optimal electrodeposition recipe involved an ionic bath composed of a ratio of 2:1 aluminum trichloride to EMIM and using square, reverse pulse waveforms. In 2010, Xtalic licensed the rights to that application and hired Dr. Ruan to pursue further research in this area.

According to Dr. Lund, the goal of the research team was to figure out how processes developed at MIT by Dr. Ruan could be scaled up to a commercial level. Dr. Lund managed the team and guided the research; Dr. Ruan tested samples and served as project coordinator; Martin participated in electrodeposition experiments; and Dr. Witold Paw worked with bath chemistry development.

In March 2013, Xtalic filed a patent application entitled "Electrodeposition in Ionic Liquid Electrolytes." U.S. Patent Application No. 13/830,531, Publication No. US 2014/0272458 A1 (Sep. 18, 2014) (Ruan et al, applicant) ('531 Application). CP at 4372. The named inventors were Dr. Ruan, Dr. Paw, Martin, and Dr. Lund. Although the patent application "focused on chemistries, methods, and systems for use with aluminum manganese based alloys," it specified that the disclosed processes are "applicable to the electrodeposition of any metal based system in an ionic liquid electrolyte." CP at 4393.

In May 2013, Xtalic and Apple entered into a joint development agreement. According to Dr. Lund, Xtalic had been seeking to engage Apple as a research partner

or customer since 2010. Shortly thereafter, Martin left Xtalic to work at Hughes Research Laboratories in California.

In May 2014, Xtalic filed a patent application entitled "Preparation of Metal Substrate Surfaces for Electroplating in Ionic Liquids." U.S. Patent Application No. 14/271,371, Publication No. US 2015/0322582 A1 (Nov. 12, 2015) (Freydina et al, applicant) ('371 Application). CP at 4561. The named inventors were Dr. Evgenia Freydina, Dr. Ruan, Dr. Schuh, and Dr. Lund. The application described "methods for preparing metal substrates prior to electroplating in order to provide a well-adhered electroplated metal layer," including aluminum or aluminum alloys. CP at 4571.

Lomasney was "stunned" when she learned of Xtalic's patent applications. CP at 4006. She believed they disclosed specific formulations and approaches that Martin worked on or knew about at Modumetal, and could prevent Modumetal from further developing this technology.

In April 2016, Modumetal filed a lawsuit asserting six claims: (1) breach of obligation of confidentiality against Martin, (2) breach of contract against Martin, (3) misappropriation of trade secrets against Martin, (4) inducement to breach of obligation of confidentiality owed to Modumetal against Xtalic, (5) inducement to breach of contractual obligation of confidentiality owed to Modumetal against Xtalic, and (6) misappropriation of trade secrets against Xtalic.

In June 2016, Modumetal served its first set of discovery requests on Xtalic, focusing on the '531 Application. Xtalic objected to discovery related to the merits of the case "unless and until jurisdiction over Xtalic has been established, until Modumetal identifies the trade secrets at issue with particularity so as to determine the appropriate

scope of discovery, and until a protective order and the appropriate protections for confidential and proprietary information... is entered." CP at 3066-67. The trial court entered a protective order to address the parties' concerns regarding secrecy of information, and subsequently granted several motions to seal certain documents to protect confidential information.

In July 2016, Xtalic filed a motion to dismiss on the pleadings pursuant to CR 12(c), arguing that the court lacked personal jurisdiction under RCW 4.28.185. Modumetal opposed the motion. The trial court concluded that Xtalic is subject to personal jurisdiction, and it denied Xtalic's motion to dismiss.

In September and October 2016, Modumetal provided additional information to Xtalic. In response, Xtalic agreed to provide limited document production. In November 2016, Modumetal moved to compel Xtalic to fully participate in discovery, and Xtalic moved to compel Modumetal to identify its trade secrets with specificity. In January 2017, the trial court granted Modumetal's motion to compel discovery from Xtalic, granted in part Xtalic's motion to compel Modumetal to identify its trade secrets with particularity, and granted Modumetal's motion to seal certain documents and allow for the filing of redacted versions. Both parties produced additional documents.

In January 2017, Modumetal issued a second set of discovery requests, this time focusing on the '371 Application. Xtalic objected arguing that discovery on the '371 Application is outside the scope of the complaint and that Modumetal failed to identify its trade secrets with particularity. Modumetal moved to compel responses to its second set of discovery requests, and Xtalic moved for a protective order. The trial court concluded that although the language of the complaint did not foreclose discovery on

the '371 Application, and there is no surprise involved, such discovery "was clearly an afterthought that arose after significant discovery had already been completed." CP at 692. Thus, allowing such discovery without a specific identification from Modumetal as to what trade secrets or confidential information were allegedly disclosed by Martin would constitute a "'fishing expedition.'" CP at 692. The court denied without prejudice Modumetal's motion to compel discovery and granted Xtalic's motion for protective order regarding the discovery on the '371 Application. The court stated that it would consider a motion to compel anew if Modumetal complies with the court's previous order to identify and describe its trade secrets with particularity.

In response, Modumetal supplemented its disclosures and continued to seek discovery from Xtalic on the '371 Application. When Xtalic indicated that the requested documents were subject to attorney-client privilege, Modumetal asked Xtalic to produce a privilege log identifying which documents it was withholding so they could consider whether privilege attaches and file a motion to compel if necessary. Xtalic indicated that it would provide a privilege log, but it never did so.

In March 2017, Xtalic moved for summary judgment. Xtalic supported its motion with declarations from Dr. Lund and Martin. Modumetal argued that Xtalic's summary judgment motion should be denied, or at least continued pending further discovery pursuant to CR 56(f). Modumetal offered two declarations from Charles Hozeska, an expert in electrodeposition of aluminum and aluminum alloys on various substrates using ionic baths. As Lead Materials Engineer for Apple, Hozeska was part of the Apple team that approached Modumetal in 2009 regarding the development of a commercially

viable ionic electroplating process for aluminum. After responding to Xtalic, Modumetal renewed its motion to compel regarding the '371 Application.

On April 14, 2017, the trial court granted summary judgment to Xtalic on all claims. In its oral ruling, the court stated that it had not seen evidence of misappropriation. Specifically, it stated that there was no evidence that the patent applications exist because of a disclosure of protected information; rather, there was only a "coincidental or circumstantial end result that covers topics of the same nature that Mr. Martin worked on at Modumetal, without ... a clear specification as to what exactly it is he is supposed to have conveyed, and how that might have been conveyed." Verbatim Report of Proceedings (VRP) (4/14/17) at 67. Regarding the breach of confidentiality claims, the court stated that they are preempted "to the extent that I understand that the confidential information and the trade secret information are identical." VRP (4/14/17) at 65. Without explicitly ruling on Modumetal's motion to compel, the trial court denied Modumetal's CR 56(f) motion for a continuance to pursue further discovery, finding that Modumetal failed to "specify the information that they think they're going to receive...." VRP (4/14/17) at 64.

Modumetal appealed the order granting summary judgment and the order denying its CR 56(f) motion for a continuance. This court granted Modumetal's motion to file unredacted briefs under seal pursuant to GR 15(c)(2). Modumetal appealed.

## DISCUSSION

### Misappropriation of Trade Secrets

We review de novo a trial court's decision to grant summary judgment. Mohr v. Grantham, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). The moving party is entitled to

summary judgment as a matter of law if there is no genuine issue as to any material fact. CR 56(c). "The defendant may support the motion by merely challenging the sufficiency of the plaintiff's evidence as to any such material issue." Las v. Yellow Front Stores, Inc., 66 Wn. App. 196, 198, 831 P.2d 744 (1992). In response, "the nonmoving party 'must set forth specific facts' demonstrating a genuine issue of fact." Boguch v. Landover Corp., 153 Wn. App. 595, 610, 224 P.3d 795 (2009) (quoting Las, 66 Wn. App. at 198). All facts and reasonable inferences are drawn in the light most favorable to the nonmoving party. Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., Inc., 125 Wn. App. 227, 232, 103 P.3d 1256 (2005). However, "[t]he nonmoving party may not rely on speculation or argumentative assertions that unresolved factual issues remain." Little v. Countrywood Homes, Inc., 132 Wn. App. 777, 780, 133 P.3d 944 (2006) (citing Marshall v. Bally's Pacwest, Inc, 94 Wn. App. 372, 377, 972 P.2d 475 (1999). "Summary judgment is proper 'only if reasonable persons could reach only one conclusion.'" Kelsey Lane Homeowners Ass'n., 125 Wn. App. at 232 (quoting Hansen v. Friend, 118 Wn.2d 476, 485, 824 P.2d 483 (1992)).

Modumetal argues that the trial court erred in dismissing its claims for misappropriation of trade secrets against Xtalic. The Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW, "codifies the basic principles of common law trade secret protection" by which a plaintiff can receive damages for misappropriation of trade secrets. Ed Nowogroski Ins., Inc. v. Rucker, 137 Wn.2d 427, 438, 971 P.2d 936 (1999) (citing MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993).

"A plaintiff seeking to establish a trade secrets claim under [UTSA] has the burden of proving that legally protectable secrets exist." Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 49, 738 P.2d 665 (1987). RCW 19.108.010(4) defines "Trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Thus, in order to have a legally protectable interest in trade information, a party must establish (1) that the information derives independent economic value from not being generally known or readily ascertainable to others who can obtain economic value from knowledge of its use and (2) that reasonable efforts have been taken to maintain the secrecy of the information." Precision Moulding & Frame, Inc. v. Simpson Door Co., 77 Wn. App. 20, 25, 888 P.2d 1239 (1995). The plaintiff's "declarations and affidavits must provide specific, concrete examples illustrating that the ... information meets the requirements for a trade secret." Belo Management Services, Inc. v. ClickA Network, 184 Wn. App. 649, 657, 343 P.3d 370 (2014).

A person violates UTSA by misappropriating a trade secret. RCW 19.108.010(2)(b) defines "misappropriation" in relevant part as the:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) Used improper means to acquire knowledge of the trade secret; or
> (ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was ... (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use....

Misappropriation of trade secrets can be notoriously difficult to prove:

'Plaintiffs in trade secret cases, who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret by the third parties, are confronted with an extraordinarily difficult task. Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything....'

Monovis, Inc. v. Aquino, 905 F.Supp. 1205, 1231 (W.D.N.Y. 1994) (quoting Greenberg v. Croydon Plastics Co., Inc., 378 F.Supp. 806, 814 (E.D.Pa. 1974).

Modumetal argues that Xtalic's patent applications, along with Hozeska's expert testimony explaining in detail how those patent applications contained confidential information and trade secrets that were directly connected to Martin's and Unger's lab notebooks, is sufficient to create a genuine issue of fact as to whether Xtalic misappropriated Modumetal's trade secrets. It contends that the act of filing patent applications that included its trade secrets is sufficient to constitute misappropriation.

Hozeska testified that Martin was present at most or all of the meetings with Apple and "was a significant part of the development team." CP at 4347. Regarding evidence of misappropriation, Hozeska testified that there is a "very substantial overlap" between what Martin did at Modumetal and the disclosure and claims of the '531 Application. CP at 4348. Specifically, he said the disclosure and many of the original claims of the '531 Application are "extremely broad" and "directed to the very same parameters, chemistry, alloys, and bath compositions" researched by Martin and others during Martin's tenure at Modumetal. CP at 4349. Hozeska's declaration described in detail how, in his opinion, the claims in the '531 Application correlated to Martin's and Unger's work at Modumetal. Hozeska also testified that the '371 Application "describes

14

and claims the same surface preparation techniques that Mr. Martin did at Modumetal," and he linked Xtalic's patent claims with experiments in Martin's lab notebooks. CP at 4362.

Xtalic argues that this evidence was insufficient to survive summary judgment. First, Xtalic asserts that Modumetal failed to specify its trade secrets with particularity. However, in its Fourth Supplemental Response to Xtalic's interrogatories, Modumetal specified numerous processes and techniques for the electrodeposition of aluminum and aluminum alloys using ionic liquid electrodeposition baths (relevant to the '531 Application) and also for the preparation of metal substrate surfaces for electroplating in ionic liquids (relevant to the '371 Application). And Hozeska noted that Modumetal's list of confidential information and trade secrets is even more specific than what Xtalic listed as inventions in the '531 Application.

Xtalic then argues that all of Modumetal's alleged trade secrets fail as a matter of law for lack of evidence of misappropriation. Xtalic first asserts that there is no evidence Martin provided job application information that allowed Xtalic to deduce that Modumetal was researching electrodeposition of aluminum in ionic liquids. But Hozeska testified that Xtalic knew or should have known this, because Martin's resume indicated that he had only worked for Modumetal; that he had experience working with ionic liquids; that he had a patent pending for the deposition of aluminum; and that Xtalic immediately put him to work on its aluminum project.

Xtalic also argues that none of Modumetal's claimed trade secrets qualify as such because the information was in the public domain. But Hozeska specifically disputed this assertion. For example, he stated that the reel-to-reel process described in

15

Martin's Modumetal lab notebooks was innovative, not previously known in the art, and was expressly claimed by Xtalic in the '371 Application. Regarding BASF's ionic baths, Hozeska stated the fact that BASF liquids could be used for commercial processes was unknown. He further noted that Martin and Unger modified BASF's off-the-shelf liquids with additives, parameters, and plating processes claimed as novel in the '371 Application. Moreover, he stated that Xtalic's assertion that this information was publicly known contradicts its declaration to the U.S. Patent and Trademark Office that the claimed inventions are original.

Xtalic next challenges Modumetal's trade secret claims regarding various bath compositions, processes, and substrate preparation methods. It asserts that Martin worked on fundamentally different metals, chemistry, and processes at Xtalic than he did at Modumetal. But Hozeska testified that the '531 Application "includes broad disclosure and claims that are identical or nearly identical to the work that Mr. Martin and other Modumetal researchers performed while Mr. Martin worked at Modumetal," including "the very same parameters, chemistry, alloys, and bath composition that Mr. Martin and others researched at Modumetal during Mr. Martin's tenure." CP at 4348-49. Similarly, Hozeska testified that the '371 Application "describes and claims the same surface preparation techniques that Mr. Martin did at Modumetal." CP at 4362.

Xtalic further asserted that Martin had nothing to share because his Modumetal research was unsuccessful. But there is evidence that Martin was kept apprised of Modumetal's electrodeposition research after his colleague Jesse Unger took over the project. And Hozeska and Lomasney both indicated that Modumetal made substantial progress on such research during the time Martin was there.

Xtalic further contends that the mere fact that patent claims cover processes attempted by a member of a research team at a prior employer, does not allow an inference of misappropriation. But Xtalic cites no cases holding that such proof is never sufficient to overcome summary judgment. And there are cases that generally support Modumetal's position. See, e.g. Altavion, Inc. v. Konica Minolta Systems Laboratory Inc., 226 Cal.App. 4th 26, 66, 171 Cal.Rptr.3d 714 (2014) (defendant's act of secretly filing patent applications disclosing plaintiff's ideas "was a classic violation of trade secret law"); Sokol Crystal Products, Inc. v. DSC Communications Corp., 15 F.3d 1427, 1432 (7th Cir. 1994) (jury entitled to draw inference of misappropriation based on defendant's access to plaintiff's trade secrets and development of similar product); Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353,1361 (2002) (access and similarity may support a trade secret misappropriation claim).

Xtalic next argues that Modumetal's claims fail because the evidence demonstrates that Xtalic independently developed the processes it sought to patent. The UTSA "does not offer protection against discovery by fair and honest means, such as by independent invention." Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). Xtalic points to evidence that Dr. Schuh and Dr. Ruan had been investigating electrodeposition of aluminum from ionic liquids for several years before Martin came on board. There is ample evidence in the record that Xtalic had been conducting electrodeposition research before Martin arrived. In particular, Xtalic emphasizes the value of Dr. Ruan's independently developed "optimal recipe." But Hozeska's declarations documented in detail many similarities between Martin's work at Modumetal and Xtalic's patent application claims, noting that they were very

broad and not limited to a specific "optimal recipe." In addition, Hozeska stated that just before Martin left to work for Xtalic, "Modumetal had proven that they could accomplish such electroplating at a much faster rate than was doable with the earlier electrolytic process...." CP at 4347. This creates a question of fact regarding whether and to what extent Xtalic's patent disclosures and claims were developed independently, as opposed to being derived from Modumetal's research. "In the context of trade secret misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived." SkinMedica, Inc. v. Histogen Inc., 869 F.Supp.2d 1176, 1197 (S.D.Cal. 2012).

Xtalic further argues that Modumetal's argument is based on the inevitable disclosure doctrine, which allows an employer to enjoin an employee from engaging in competitive employment based on an inference that the employee will inevitably use or disclose trade secrets. Washington has neither adopted nor rejected the inevitable disclosure doctrine. Moore v. Commercial Aircraft Interiors, LLC, 168 Wn. App. 502, 513, 278 P.3d 197 (2012). Modumetal contends that it need not rely on the inevitable disclosure doctrine, as misappropriation of trade secrets can be inferred from the patent. We agree. As discussed above, Hozeska's testimony demonstrated the possible connection between Martin's work at Modumetal and Xtalic's patent applications. Thus, we need not and do not address the applicability of the inevitable disclosure doctrine.

In sum, we conclude that Hozeska's expert testimony, along with the evidence in the record upon which he relied in reaching his conclusions, was sufficient for a reasonable jury to infer without conjecture or speculation that misappropriation of a

trade secret occurred.[4] The trial court erred in dismissing Modumetal's claims on summary judgment.

Preemption

Modumetal contends that the trial court erred in concluding that the UTSA preempted its common law claims for breach and inducement of breach of confidentiality obligations.[5] At the summary judgment hearing, the trial court agreed with Xtalic that Modumetal's common law confidentiality claims were preempted because "your description of trade secrets and confidential information are the same."[6] VRP (4/14/17) at 73.

Modumetal, citing Boeing v. Sierracin, 108 Wn.2d 38, argues that the trial court's ruling was legally erroneous because it disregarded controlling precedent. In Boeing, the Washington Supreme Court held that Washington's UTSA does not displace common law claims for breach of confidential relationship or breach of contract. The court observed that UTSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret" but does not affect "[c]ontractual or other civil liability or relief that is not based on misappropriation of a trade secret." Id. at 48 (quoting RCW 19.108.900(1)(2)(a)). The court further noted "[t]he United States Supreme Court has held that proof of trade secrets is not required for breach of confidentiality claims, which may be brought independently of trade secrets

---

[4] Xtalic also argues that Modumetal has failed to show that it was damaged by the alleged misappropriation. But because Xtalic did not present this argument to the trial court, we will not consider it on appeal. RAP 2.5(a); Lindblad v. Boeing Co., 108 Wn. App. 198, 207, 31 P.3d 1 (2001).

[5] Xtalic concedes that UTSA does not preempt Modumetal's contract-based claims.

[6] The written order indicates that summary judgment was granted because there were no genuine issues of material fact regarding Modumetal's claims. It does not reflect the trial court's oral ruling that Modumetal's breach of confidentiality claims were preempted by its trade secrets claims.

claims." Id. at 48 (citing E.I. Du Pont De Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917)). Accordingly, the Boeing court held that the trial court did not err in refusing to consolidate Boeing's trade secret, breach of confidentiality, and breach of contract claims. Id. Federal courts in Washington, following Boeing, have held that UTSA does not preempt breach of confidentiality claims. See, e.g. Pacific Aerospace & Electronics, Inc. v. Taylor, 295 F.Supp.2d 1205, 1211-12 (E.D. Wash. 2003).

Boeing has not been overruled, and it is still good law. Nevertheless, in Thola v. Henschell, 140 Wn. App. 70, 164 P.3d 524 (2007), Division Two applied a different analysis to the same issue without citing Boeing. Thola argued that the UTSA preempted Henschell's common law causes of action. Id. at 82. The court began its analysis by stating that "[a] plaintiff 'may not rely on acts that constitute trade secret misappropriation to support other causes of action.'" Id. at 82 (quoting Ed Nowogroski Ins., Inc. v. Rucker (Rucker I), 88 Wn. App. 350, 358, 944 P.2d 1093 (1997)).[7] The court then noted that "[a] majority of UTSA jurisdictions: (1) assess the facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts liability on the civil claim unless the common law claim is factually independent from the UTSA claim." Thola at 82, citing Mortgage Specialists, Inc. v. Davey, 153 N.H. 764, 778-79, 904 A.2d 652 (N.H. 2006). Stating that "proper application of this three-step analysis precludes

---

[7] Rucker did not mention or discuss Boeing, either. In Rucker, the respondent argued that UTSA displaced the appellant's tort claims for misuse of confidential information and intentional interference. The court stated that because UTSA "specifically displaces conflicting tort laws pertaining to trade secret misappropriation," a plaintiff "may not rely on acts that constitute trade secret misappropriation to support other causes of action." Rucker, 88 Wn. App. at 358. Because the tort claims were based on the same acts as the trade secrets claims, the court ruled that they were displaced by UTSA. Id.

duplicate recovery for a single wrong," the Thola court "adopt[ed] this analytical framework as a helpful guide to determine whether, under the facts of the case, the UTSA preempts a civil claim." Thola at 82. The court held that Thola's common law business expectancy claim, unlike her UTSA claim, did not involve the acquisition or disclosure of confidential information and was therefore not preempted. Id. at 83.

Xtalic offers no persuasive grounds upon which to distinguish Boeing's express holding that breach of confidentiality claims may be brought independently of trade secrets claims. Until or unless the Washington Supreme Court overrules Boeing and adopts the Thola analysis, Boeing controls. Accordingly, we follow Boeing and conclude that Modumetal's common law confidentiality claims are not preempted by its trade secrets claims, regardless of whether they are based on the same facts.

### Contractual Breach of Confidentiality Obligations

Xtalic asserts without further analysis or argument that Modumetal's claims for contractual breach of confidentiality obligation fail on the merits for the same reasons its trade secrets claims fail: an absence of genuine issues of material fact as to whether Martin shared or used Modumetal's confidential information with Xtalic, or that Modumetal suffered damages as a result. Because we conclude that Modumetal met its burden of production regarding misappropriation of trade secrets, and this evidence also forms the basis of Modumetal's contractual breach of confidentiality obligation claims, they survive as well.

### Request for Continuance

Modumetal argues that the trial court erred by denying its CR 56(f) request for a continuance to obtain further discovery. At the summary judgment hearing, the trial

21

court agreed with Xtalic that Modumetal's continuance request was a "fishing expedition that doesn't meet his burden under 56(f)" because "[h]e's got to tell you that he's got a reason to think it exists ... and there is none." VRP (4/14/2017) at 72.

We review a trial court's denial of a CR 56(f) motion for abuse of discretion. Barkley v. GreenPoint Mortg. Funding, Inc., 190 Wn. App. 58, 71, 358 P.3d 1204 (2015). "A court abuses its discretion when it bases its decision on unreasonable or untenable grounds." Clarke v. Office of Attorney Gen., 133 Wn. App. 767, 777, 138 P.3d 144 (2006).

Under CR 56(f):

> [s]hould it appear from the affidavits of a party opposing the motion that, for reasons stated, the party cannot present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A court may deny a CR 56(f) motion for continuance where "(1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact." Tellevik v. Real Property Known as 31641 West Rutherford Street, 120 Wn.2d 68, 90, 838 P.2d 111 (1992) (quoting Turner v. Kohler, 54 Wn. App. 688, 693, 775 P.2d 474 (1989)). Justice should be the primary consideration in ruling on a motion for a continuance. Coggle v. Snow, 56 Wn. App. 499, 508, 784 P.2d 554 (1990).

Regarding the '531 Application, Modumetal asserted that it had been waiting more than a month for Xtalic to provide a privilege log so that it could confer with Xtalic as to whether privilege should attach and file a motion to compel if necessary. At the

summary judgment hearing, counsel for Xtalic acknowledged that he had been working on a privilege log, saying "I'm sorry it's taken awhile" because "[t]here's thousands of documents." VRP (4/14/2017) at 67. He nevertheless justified his failure to complete and produce the privilege log prior to the summary judgment hearing, claiming that Modumetal had failed to provide "some basis by which to invade the privilege." Id. But Modumetal did not seek to invade the privilege. Rather, it sought to determine whether the privilege properly applied to all of the documents Xtalic was withholding on this basis. Moreover, in a sworn declaration, Modumetal explained that it "believes such discovery is necessary because it could reflect directly on Mr. Martin's involvement in the inventions claimed in the Ruan '531 patent application, and the preparation of the patent application itself, which would or at least could bear on whether, and to what extent, Mr. Martin used Modumetal confidential information in connection with the inventions claimed in the application and the application itself." CP at 4037. We reject Xtalic's self-serving assertion that it didn't need to provide a privilege log because everything was privileged, and we conclude that the trial court abused its discretion in denying Modumetal's CR 56(f) continuance request regarding the '531 Application.

Regarding the '371 Application, Modumetal argued that additional discovery is necessary "to determine whether and to what extent Martin's prior surface preparation work at Modumetal, was disclosed, either orally or otherwise, to Xtalic employees, including those named as inventors on the '371 Application." CP at 4038. Modumetal asserted that this discovery was relevant to Xtalic's claim that it had independently developed the '371 Application technology, and claimed that its previous discovery requests would not have covered all relevant information, such as emails not sent by

Martin. Modumetal noted that the trial court had previously denied, without prejudice, its motion to compel Xtalic to produce this information but indicated that if Modumetal disclosed its trade secrets with sufficient specificity, it would consider a new motion to compel. Modumetal asserted that it had complied with this ruling by supplementing its trade secret disclosures and refiling its motion to compel. The trial court initially indicated that it would set aside the issue of the '371 Application until considering Modumetal's motion to compel, but by the end of the hearing it reversed course and agreed with Xtalic that Modumetal had failed to specify what information the additional discovery would yield. Given that the requested discovery was subject to a pending motion to compel, which the trial court did not expressly rule on, we conclude that its decision to deny Modumetal's CR 56(f) continuance request on this matter was also an abuse of discretion.

Personal Jurisdiction

Xtalic did not cross appeal the trial court's order denying its CR 12(c) motion to dismiss for lack of personal jurisdiction under RCW 4.28.185. Instead, Xtalic raised this issue in its respondents' brief, characterizing it as an alternative ground to affirm summary judgment. Modumetal contends that Xtalic's request for affirmative relief is barred for failure to file a cross appeal. We agree.

RAP 2.4(a) provides that "[t]he appellate court will grant a respondent affirmative relief by modifying the decision which is the subject matter of the review only (1) if the respondent also seeks review of the decision by the timely filing of a notice of appeal or a notice of discretionary review, or (2) if demanded by the necessities of the case." A prevailing party that seeks no further affirmative relief from the appellate court may

argue any grounds in support of the trial court's order that are supported by the record. McGowan v. State, 148 Wn.2d 278, 288, 60 P.3d 67 (2002). However, "notice of cross-review is essential if the respondent 'seeks affirmative relief as distinguished from the urging of additional grounds for affirmance.'" Sims, 171 Wn.2d at 442-43 (quoting Robinson v. Khan, 89 Wn. App. 418, 420, 948 P.2d 1347 (1998).

Accordingly, we begin by inquiring whether Xtalic's personal jurisdiction argument, which it characterizes as an alternative ground to affirm summary judgment dismissal of Modumetal's claims, is in fact a request for affirmative relief. The Third Circuit's reasoning in EF Operating Corp. v. American Bldgs., 993 F.2d 1046 (1993) is instructive. In EF Operating Corp., one of the defendants moved for summary judgment and simultaneously moved to dismiss for lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b). The district court granted summary judgment to the defendant on the merits, but implicitly ruled against it on the jurisdictional issue. Id. at 1048. The plaintiff appealed summary judgment dismissal of its claims, but the defendant did not file a cross-appeal. Instead, the defendant raised the personal jurisdiction issue in its response brief.

The Third Circuit noted that "[u]nlike subject matter jurisdiction, which may be raised by any party or court at any time, parties must affirmatively raise a personal jurisdiction defense in a timely matter under Federal Rules of Civil Procedure 12(g) and (12)(h)(1), lest it will be deemed waived." Id. (citing Wright & Miller, 5A Federal Practice and Procedure, §1391 at 741-44 and 764-75 (1990); Myers v. American Dental Ass'n, 695 F.2d 716, 720 (3d Cir. 1982). The court then observed that, although an appellate court may affirm a lower court's decision on any basis, "[a] grant of summary judgment

and a dismissal for lack of personal jurisdiction ... are wholly different forms of relief. The latter is a dismissal without prejudice, whereas the former is a ruling on the merits which if affirmed would have preclusive effect." Id. at 1048-49 (citations omitted). It therefore concluded that seeking dismissal of the complaint for lack of personal jurisdiction cannot be characterized as seeking to support summary judgment on different grounds; rather, it seeks to vacate the summary judgment. Id. at 1049. "Thus, where an appellant files an appeal seeking review of a summary judgment for the appellee, the appellee must cross-appeal to contest the district court's adverse ruling on his motion to dismiss for lack of personal jurisdiction." Id. Because the defendant-appellee did not cross-appeal, the court declined to consider the personal jurisdiction issue. Id.

This reasoning is persuasive. In Washington, just as in the federal courts, a defense for lack of subject matter jurisdiction is never waived, but a defense for lack of personal jurisdiction is waived if not timely asserted. Robb v. Kaufman, 81 Wn. App. 182, 188, 913 P.2d 828 (1996). Here, Xtalic raised personal jurisdiction as an affirmative defense in its answer, and the trial court denied its motion to dismiss under CR 12(c), so the issue was initially preserved for appellate review. However, Xtalic chose not to cross-appeal from the trial court's dismissal of its CR 12(c) motion to dismiss. "Affirmative relief 'normally mean[s] a change in the final result at trial.'" Sims, 171 Wn.2d at 442 (quoting 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.4 author's cmt. 3, at 174 (6th ed. 2004). Because dismissal on the merits with prejudice and dismissal on jurisdictional grounds without prejudice

26

are different forms of relief, Xtalic's personal jurisdiction argument is a request for affirmative relief, not alternative grounds for affirming summary judgment.

Accordingly, Xtalic's personal jurisdiction argument is barred unless "demanded by the necessities of the case." RAP 2.4(a). "Washington courts generally apply the necessities provision of RAP 2.4(a) when the petitioner's claim cannot be considered separately from issues a respondent raises in response." Sims, 171 Wn.2d at 444. Xtalic does not explain why it failed to file a cross-appeal, or why the necessities of the case require this court to consider its jurisdictional argument. There is no reason why Modumetal's arguments regarding summary judgment could not have been considered at the same time as Xtalic's jurisdictional arguments. We therefore decline to consider it.

Reversed.

WE CONCUR:

Spearman, J.

Becker, J.